CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION v
DEPARTMENT OF CONSUMER AND INDUSTRY SERVICES

Docket No. 225363. Submitted August 13, 2002, at Lansing. Decided
December 6, 2002, at 9:00 A.M.

Centennial Healthcare Management Corporation brought an action in
the Gratiot Circuit Court against the Department of Consumer and
Industry Services and several agents of the department, seeking
declaratory and injunctive relief against the defendants' require-
ment that the plaintiff provide certain accident records and inci-
dent reports relating to a state-licensed nursing home managed by
the plaintiff. The preparation and maintenance of such records and
reports and their availability to the department director or an
authorized representative of the director are required by 1979 AC,
R 325.21101 and R 325.21104. The court, Randy L. Tahvonen, J.,
granted summary disposition for the defendants, ruling that the
plaintiff had failed to state a claim on which relief can be granted
after the court rejected the plaintiff's contention that the records
and reports, having been submitted to the nursing home's peer
review committee, were privileged under MCL 333.20175(8). The
plaintiff appealed.

The Court of Appeals held:

The privilege provided by MCL 333.20175(8) was designed to
assure that honest assessment and review of performance is under-
taken in peer review committees. In light of other purposes out-
lined in the Public Health Code, especially those involving the
licensing and certification of health care facilities such as nursing
homes, it must be concluded that the peer review privilege is not
undermined by administrative rules requiring a nursing home to
keep and make available for review and copying accident records
and incident reports that contain basic factual material but do not
require the reporting of the internal deliberative process of
a peer review committee. The information required by 1979 AC,
R 325.21104 does not implicate the deliberation process of a nurs-
ing home peer review committee.

Affirmed.

HEALTH — NURSING HOMES — ACCIDENT REPORTS AND INCIDENT REPORTS —
    PEER REVIEW PRIVILEGE.

The statute that provides a privilege for records, data, and knowledge collected for or by individuals or committees assigned a peer review function in a health care facility does not apply to preclude the state from obtaining nursing home accident records and incident reports that have been submitted for peer review; the administrative rule that requires nursing homes to prepare and maintain such records and reports does not undermine the peer review function because the rule does not require information that implicates the deliberative process of the peer review committee (MCL 333.20175[8]; 1979 AC, R 325.21101 and R 325.21104).

*Smith, Haughey, Rice & Roegge* (by *Marilyn S. Nickell Tyree*) for the plaintiff.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *R. Philip Brown*, Assistant Attorney General, for the defendants.

Amici Curiae:

*Lebenbom & Rothman, P.C.* (by *Andrew R. Rothman*), for Health Care Association of Michigan.

*Olsman, Ganos & Mueller, P.C.* (by *Jules B. Olsman*), for Citizens for Better Care.

Before: HOOD, P.J., and HOLBROOK, JR., and OWENS, JJ.

HOLBROOK, JR., J. Plaintiff Centennial Healthcare Management Corporation appeals as of right from an order of the circuit court granting defendants summary disposition under MCR 2.116(C)(8). Centennial, a Georgia corporation, manages Westgate Healthcare Center, an eighty-one-bed, state-licensed nursing home located in St. Louis, Michigan. We affirm.

From May 25, 1999, through May 28, 1999, defendants Sahreleen Bower, Lawrence Miller, Lorraine Woodward, Raymond Hopkins, Jennifer Ezinga, and Timothy Smith, as agents of defendant Michigan

Department of Consumer and Industry Services (MDCIS), conducted an annual survey of Westgate. During the survey, the agents requested that Centennial produce all incident reports and accident records (hereinafter I & A reports) for the prior six-month period. Centennial initially refused, asserting that because the documents had been generated and maintained by the Leadership Council, Westgate's quality assurance and assessment committee, they were protected peer review material. Eventually, Centennial agreed to produce only certain I & A reports pertaining to three Westgate residents.[1]

Centennial alleges that in retaliation for its refusal to release all the I & A reports sought by the MDCIS agents, Westgate was cited for forty-nine deficiencies in the MDCIS Statement of Deficiencies, twenty-one of which were violations of federal standards. One of the federal deficiencies was based on Centennial's failure to provide the I & A reports. After Centennial's representatives met with the MDCIS, the agency agreed to delete this deficiency. The agency also agreed to reduce the listed severity of a deficiency concerning room size from a level "E" to a level "B."[2] Westgate

---

[1] According to Peter Brogger, Westgate's administrator, Westgate staff write out an accident report "any time an accident occurs at the facility, whether it involves a resident, an employee, a visitor, or otherwise. Incident reports are created . . . any time there is an occurrence that is out of the ordinary." According to Brogger, standard procedure calls for the I & A reports to be reviewed by the Environment of Care Committee (ECC), a subcommittee of the Leadership Council. Thereafter, the ECC forwards its recommendations and the I & A reports to the Leadership Council for final action.

[2] Brogger testified that Westgate had previously been cited for inadequate room size because the facility's multiresident rooms measure seventy-nine square feet/resident, as opposed to the eighty square feet required by regulation. Historically, Brogger continued, this violation was cited at level B, which indicates substantial compliance with the regulation.

was informed that these changes would not affect the proposed remedies stemming from the annual survey.

In a letter dated June 15, 1999, the MDCIS informed Centennial that "[b]ased on the current survey findings and [Westgate's] . . . history of extended periods of noncompliance for previous surveys," the MDCIS would be immediately imposing the following enforcement remedies: (1) a Directed Plan of Correction, effective July 4, 1999; and (2) Directed In-Service Training, also effective July 4, 1999. The letter also indicated that the MDCIS would recommend additional federal action if Westgate did not achieve substantial compliance by July 17, 1999. "We are also recommending to the HCFA[3] Region V Office and the State Medicaid Agency," the letter continued, "that your provider agreement(s) be terminated on *November 28, 1999* if substantial compliance is not achieved by that time." (Emphasis in original.)

According to Centennial, during a revisit survey that took place from August 10, 1999, through August 16, 1999, MDCIS agents again repeatedly asked for the production of various I & A reports. Specifically, Centennial asserts that at various times the agents alternatively sought I & A reports for (1) the entire facility, (2) the entire Dementia Unit of the facility, and finally (3) six particular residents of the Dementia Unit. Centennial again initially denied the requests on the basis that the material was protected peer review material. However, Centennial asserts that under the threat of prosecution made by defendant Woodward, it reluctantly agreed to produce the I & A

---

[3] HCFA is an acronym for Health Care Financing Administration, which is an agency within the United States Department of Health and Human Services (HHS).

reports for the six residents of the Dementia Unit. Woodward testified that she never threatened Westgate personnel with civil or criminal penalties if they failed to produce the I & A reports.

Centennial contends that as a result of reviewing the I & A reports for these six residents, defendants found three specific violations. Regarding one of these violations, designated F-224 in the August 13, 1999, Statement of Deficiencies, Centennial argued below that the MDCIS report on the violation contained a "verbatim recitation[]of the . . . [I & A report], including the follow-up recommendations and the corrective actions (listed as preventive actions) taken by the facility."[4]

Centennial alleges that on August 23, 1999, Westgate received by way of facsimile a letter from the MDCIS stating that it would recommend the imposition of a denial of payment for new Medicare and Medicaid residents,[5] a civil penalty of $3,050 a day beginning June 2, 1999, and continuing until terminated by the MDCIS, and termination from the Medicare and Medicaid program effective September 11, 1999.[6] The August 23, 1999, MDCIS letter also indicated that an additional Directed Plan of Correction was being imposed. The HCFA concurred with the recommended remedies.

---

[4] Two of the federal deficiencies listed in the August 13, 1999, Statement of Deficiencies, were rated at level K, which indicates the existence of an immediate jeopardy. 42 USC 1395i-3(h)(1)(A) and (B) delineate a distinction between deficiencies that "immediately jeopardize the health or safety of its residents," and deficiencies that "do not immediately jeopardize the health or safety of its residents." Differing remedial actions are authorized depending on whether the residents are found to be in immediate jeopardy.

[5] In the August 23, 1999, MDCIS letter, the MDCIS indicated that denial of payment for new Medicare and Medicaid residents was mandatory.

[6] These remedies are authorized under 42 USC 1395i-3(h)(2).

In count I of its two-count complaint, Centennial sought, in part, declarations that (1) the I & A reports are statutorily protected peer review material, (2) that 1979 AC, R 325.21101 contravenes statutory and case law, (3) that defendants shall return all I & A reports and be prohibited from obtaining further I & A reports, (4) that the May 1999 and August 1999 survey results were null and void because they were made in retaliation for Centennial's refusal to supply the I & A reports, and (5) that all remedies were null and void. In support, Centennial cited MCL 333.20175 and 333.21515, 42 USC 1395i-3(b)(1)(B) and 42 USC 1396r(b)(1)(B),[7] and 42 CFR 483.75(b).[8] In count II,

---

[7] Subsection 1395i-3(b)(1)(B) reads:

A skilled nursing facility must maintain a quality assessment and assurance committee, consisting of the director of nursing services, a physician designated by the facility, and at least 3 other members of the facility's staff, which (i) meets at least quarterly to identify issues with respect to which quality assessment and assurance activities are necessary and (ii) develops and implements appropriate plans of action to correct identified quality deficiencies. A State or the Secretary may not require disclosure of the records of such committee except so far as such disclosure is related to the compliance of such committee with the requirements of this subparagraph.

Subsection 1396r(b)(1)(B) reads:

A nursing facility must maintain a quality assessment and assurance committee, consisting of the director of nursing services, a physician designated by the facility, and at least 3 other members of the facility's staff, which (i) meets at least quarterly to identify issues with respect to which quality assessment and assurance activities are necessary and (ii) develops and implements appropriate plans of action to correct identified quality deficiencies. A State or the Secretary may not require disclosure of the records of such committee except so far as such disclosure is related to the compliance of such committee with the requirements of this subparagraph.

[8] 42 CFR 483.75(b) reads in pertinent part: "The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility."

Centennial sought to have defendants enjoined from (1) any further requests for I & A reports, (2) imposing any remedies stemming from the May and August 1999 surveys, (3) making any recommendations for enforcement actions based on these surveys, and (4) engaging in future retaliatory conduct.

Centennial also filed a motion for declaratory judgment and preliminary and permanent injunction along with its complaint. The essence of Centennial's argument in support of its motion was that the I & A reports are, by statute, absolutely privileged materials, and that the MDCIS' findings of deficiencies were made in retaliation for Centennial's handling of requests for this privileged material. Centennial asserted that this is not a matter for the federal courts because they were not asking for a court order declaring any remedies imposed by the federal government invalid.

In their brief in opposition to the motion, defendants focused on the claim that the May and August 1999 surveys were part of a federal investigatory protocol, and that they were just following federal and state rules and regulations when requesting the I & A reports. Defendants argued that Centennial could not "immunize" itself from disclosure by characterizing I & A reports as peer review material. At the hearing on the motion, defendants argued that

> [t]he facility is free to keep confidential any other records that are prepared or collected by its peer review committee, but it is not permitted to make confidential otherwise non-confidential accident records and incident reports by the simple expedient of giving them to their peer review committee or even having them prepared by that committee during the peer review process.

Defendants also argued that the circuit court lacked jurisdiction because Centennial's claims arise under the Medicare Act, given that they were "part of plaintiff's broader claim for continued Medicare payments." Centennial's exclusive remedy, defendants argued, lies in the federal courts. Further, defendants argued that Centennial's claim should be dismissed because Centennial failed to exhaust its state and federal administrative remedies, and that Centennial had failed to establish the requirements for an injunction. The court denied Centennial's motion for declaratory and injunctive relief.

Thereafter, defendants filed a motion for summary disposition under MCR 2.116(C)(8). Defendants again argued that the I & A reports are not protected peer review documents, that the circuit court lacked jurisdiction to hear this claim based on the Medicare Act, and that Centennial has failed to exhaust its administrative remedies. In response, Centennial made the same arguments it had made in support of its motion for declaratory judgment and preliminary and permanent injunction, i.e., that the I & A reports are privileged by statute, that any promulgated rule that contravenes this legislative mandate is unenforceable, and that defendants took retaliation against plaintiff for its assertion of the peer review privilege. Centennial also argued that the need for an evidentiary record precluded summary disposition under MCR 2.116(C)(8). The court granted defendants' motion for summary disposition, reasoning as follows:

> With regard to the issue of . . . subject matter jurisdiction, I am satisfied that any adverse actions or claim of retaliatory violation reports are subject to administrative review at the federal level, and that this Court does not have sub-

ject matter jurisdiction to determine the propriety of the reports, recommendations, or violations claimed.

With respect to the remaining issue, which is as to the status of these accident and incident reports, we have state section 20175 that says that information generated for a nursing home quality assurance and peer review committee is confidential. . . . The legislature, I think, wants to encourage full and free discussion by peer review and quality assurance committees of shortcomings in nursing home operation. It wants to make certain that those discussions can be based upon complete and reliable information furnished the committee without fear of civil repercussions in litigation for money damages by those who may have been involved or suffered the injures giving rise to the review.

At the same time, the legislature has delegated to the state agency here the power to promulgate rules and regulations regarding reports in connection with nursing home activities. And we have rule 1101 which says that the nursing home has an obligation to maintain accident and incident reports . . . and then 1104 goes on to define what the required contents of those reports are.

It seems pretty clear to the Court that the problem stems from the fact that those reports and that information can be used in a broad variety of contexts without the protection of the confidentiality cloak thrown over similar information that may be submitted to a peer review committee. But the fact that the same information may have two destinations, and may end up being treated in two different ways, and may be accessible at two different levels to third parties or others, doesn't change, I think, the fundamental question, and that is, whether or not the agency can promulgate 1101 and 1104 and by doing so require . . . disclosure to a public agency through it, perhaps, to the public, of information that would otherwise be confidential. It seems to me that the answer to that question is a matter of law, and as a matter of law, I think the answer is yes.

Centennial first argues on appeal that the trial court erred in granting summary disposition to defendants. Centennial asserts that the plain and unambig-

uous language of MCL 333.20175(8) indicates that information collected during the peer review process is absolutely protected from disclosure. Centennial further argues that defendants' reliance on 1979 AC, R 325.21101 and 1979 AC, R 325.21104 is misplaced because these administrative rules directly contravene both the letter and the intent of the statute. Acknowledging the importance of the peer review process, defendants counter that there is nothing in the history of the privilege to suggest that the Legislature intended that a health care facility could use the process as a repository for any and all information it saw fit to deposit therein. Defendants further assert that in order to meet responsibilities mandated by state and federal statutes, the MDCIS promulgated R 325.21101, which requires that a facility, not its quality review committee, keep the records sought during the annual and revisit surveys. There is no requirement, defendants contend, that this material also be submitted for peer review, and a facility's decision to submit the documents to peer review does not immunize them from the requirements of 1979 AC, R 325.21101 and 1979 AC, R 325.21104.

This case involves a review of the trial court's decision to grant defendants' motion for summary disposition and the construction of the applicable statutory provision establishing the peer review privilege, both of which we review de novo. *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492, 497; 638 NW2d 396 (2002). The existence of a privilege is a mixed question of fact and law. A trial court's factual findings are reviewed for clear error, while its application of the law to the facts is reviewed de novo. *Schroeder v Detroit*, 221 Mich App 364, 366; 561 NW2d 497 (1997).

"MCR 2.116(C)(8) permits summary disposition when the opposing party has failed to state a claim upon which relief can be granted. A motion under this subsection determines whether the opposing party's pleadings allege a prima facie case. The court must accept as true all well-pleaded facts." *Stehlik v Johnson (On Rehearing)*, 206 Mich App 83, 85; 520 NW2d 633 (1994). "The overriding goal guiding judicial interpretation of statutes is to discover and give effect to legislative intent. The starting place for the search for intent is the language used in the statute." *Bio-Magnetic Resonance, Inc v Dep't of Pub Health*, 234 Mich App 225, 229; 593 NW2d 641 (1999) (citations omitted). "If the language of the statute is clear and unambiguous, then no further interpretation is required. However, judicial construction is appropriate when reasonable minds can differ with regard to the meaning of the statutory language." *Benedict v Dep't of Treasury*, 236 Mich App 559, 563; 601 NW2d 151 (1999) (citations omitted).

Centennial argues that MCL 333.20175(8) conflicts with both 1979 AC, R 325.21101 and 1979 AC, R 325.21104. We disagree. MCL 333.20175(8) provides:

> The records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency, or an institution of higher education in this state that has colleges of osteopathic and human medicine, are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena.

1979 AC, R 325.21101 states in pertinent part: "All of the following records shall be kept in the home and shall be available to the director or his or her authorized representative for review and copying if neces-

sary: * * * (d) Accident records and incident reports."

1979 AC, R 325.21104 states in pertinent part:

> An accident record or incident report shall be prepared for each accident or incident involving a patient, personnel, or visitor and shall include all of the following information:
>
> (a) Name of person involved in accident or incident.
>
> (b) Date, hour, place, and cause of accident or incident.
>
> (c) A description of the accident or incident by any observer who shall be identified and a statement of the effect of the accident or incident on the patient and any other individual involved.
>
> (d) Name of physician notified and time of notification when appropriate.
>
> (e) Physician's statement regarding extent of injuries, treatment ordered, and disposition of person involved.
>
> (f) Corrective measures taken to avoid repetition of accident or incident.
>
> (g) Record of notification of the person or agency responsible for placing and maintaining the patient in the home, the legal guardian, and, in a case where there is no legal guardian, the designated representative or next of kin.

Subsection 20175(8) is made up of five parts: (1) a list describing the types of items that are potentially covered by the peer review privilege; (2) the requirement that these items be "collected for or by individuals or committees assigned a peer review function"; (3) a list of the entities to which the privilege applies; (4) the pronouncement that items satisfying these three criteria are "confidential"; and (5) a limit on the uses to which these items can be put, which includes the command that those uses are to be found in article 17 of the Public Health Code, as well as the specific directives that these items "are not public records" and "are not subject to court subpoena." The

essence of the parties' disagreement lies in the application of the first two of these five parts.

Subsection 20175(8) defines the types of items that can fall under the peer review by class and subclass. The class is defined by the list "records, data, and knowledge." The inclusion of the final term, "knowledge," makes this a very broad definition.[9] The range established by the subclass specifies that these items must have been "collected for or by individuals or committees assigned a peer review function in a health facility or agency, or an institution of higher education in this state that has colleges of osteopathic and human medicine."

The "collection" requirement is somewhat ambiguous. To "collect" means to "bring together in a group or mass, gather," or to "accumulate as a hobby or for study." *The American Heritage Dictionary of the English Language* (3d ed, 1996), p 372. In *Monty v Warren Hosp Corp*, 422 Mich 138, 146-147; 366 NW2d 198 (1985), our Supreme Court gave some guidance on the meaning of the word in the peer review context when it stated that "mere submission of information to a peer review committee does not satisfy the collection requirement so as to bring the information within the protection of" MCL 333.21515.[10] In support of this assertion, *Monty* cited *Marchand v Henry*

---

[9] Knowledge includes "[t]he sum or range of what has been perceived, discovered, or learned," as well as "[s]pecific information about something." *The American Heritage Dictionary of the English Language* (3d ed, 1996), p 998.

[10] Section 21515 states the peer review privilege applicable to hospitals. It reads: "The records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena."

*Ford Hosp*, 398 Mich 163; 247 NW2d 280 (1976). In *Marchand*, a doctor had, of his own volition, kept records on a medical procedure he had used. *Id.* at 167. The *Marchand* Court concluded that the fact that these records had later been presented to a peer review committee did not satisfy the "collection" requirement of the statute. *Id.* at 167-168.

In *Dye v St John Hosp & Medical Ctr*, 230 Mich App 661, 670-671; 584 NW2d 747 (1998), this Court concluded that documents submitted to a credentials committee by or on behalf of a physician seeking staff privileges at a hospital are privileged under subsection 20175(8) and § 21515. In so doing, the Court distinguished *Marchand*, and offered the following reasoning:

> As in any situation regarding application for professional employment, [the physician seeking staff privileges] was aware of the requirements of the committee with respect to the credentials, endorsements, and other materials it wanted to review before granting staff privileges. In that sense, materials in the file relating to [the physician's] application for privileges were "collected for or by" the committee and the confidentiality provisions of the statutes apply. [*Id.*]

It is a long-established legal maxim that privileges "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." 8 Wigmore, Evidence (McNaughton rev), § 2291, p 554. In the case at bar, we believe that the collection requirement must be limited by the function of the committee and the interest the privilege is designed to protect. The privilege is designed to assure that honest assessment and review of performance is undertaken in peer review committees. It is

assumed that candid and conscientious evaluation would be undermined if the work of the peer review committee was not, in some way, privileged.[11] As the Supreme Court observed in *Attorney Gen v Bruce*, 422 Mich 157, 169; 369 NW2d 826 (1985):

The rationale for protecting the confidentiality of the records, data, and knowledge of such committees was set

---

[11] We note that authority exists that rejects the premise that the function of a peer review committee would be impaired if such a privilege did not exist. See, e.g., *Syposs v United States*, 63 F Supp 2d 301, 306 (WD NY, 1999). Indeed, the Michigan Supreme Court appears to be heading away from the validity of this presumption. In *Bradley v Saranac Community Schools Bd of Ed*, 455 Mich 285, 299-300; 565 NW2d 650 (1997), the Court observed:

The plaintiffs assert that the integrity of the evaluation process will be compromised by the disclosure of their personnel records. They suggest that the evaluators will be less inclined to candidly evaluate their employees if the evaluations are to be made public. We draw the opposite conclusion. Making such documents publicly available seems more likely to foster candid, accurate, and conscientious evaluations than suppressing them because the person performing the evaluations will be aware that the documents being prepared may be disclosed to the public, thus subjecting the evaluator, as well as the employee being evaluated, to public scrutiny.

In support of this assertion, the Court cited *Univ of Pennsylvania v EEOC*, 493 US 182; 110 S Ct 577; 107 L Ed 2d 571 (1990), a case involving peer review materials in an academic setting. In declining to recognize a common-law privilege protecting from disclosure peer review material, the United States Supreme Court made the following observations:

Finally, we are not so ready as petitioner seems to be to assume the worst about those in the academic community. Although it is possible that some evaluators may become less candid as the possibility of disclosure increases, others may simply ground their evaluations in specific examples and illustrations in order to deflect potential claims of bias or unfairness. Not all academics will hesitate to stand up and be counted when they evaluate their peers. [*Id.* at 200-201.]

Regardless of the validity of the presumption, it still remains that Michigan has identified this purpose as the primary "rationale for protecting the confidentiality of the records, data, and knowledge of such committees." *Attorney Gen v Bruce*, 422 Mich 157, 169; 369 NW2d 826 (1985).

forth in an oft-quoted opinion of the United States District Court for the District of Columbia:

"Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject the discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations." [Quoting *Bredice v Doctors Hosp, Inc*, 50 FRD 249, 250 (D DC, 1970).]

Under the first definition of the word "collect" cited above, a peer review committee could be said to have collected anything that it directs its facility to compile. We conclude that this is simply too broad a reading of the statutory privilege. See *Howe v Detroit Free Press, Inc*, 440 Mich 203, 226; 487 NW2d 374 (1992). It is not in keeping with the logic of the privilege's principle. However, the second cited definition for "collect" cited above is in keeping with the interests the privilege is protecting; in order to effectuate its purpose, such a committee will necessarily accumulate material for study.

Certainly, in the abstract, a peer review committee cannot properly review performance in a facility without hard facts at its disposal. However, it is not the facts themselves that are at the heart of the peer review process. Rather, it is what is done with those facts that is essential to the internal review process, i.e., a candid assessment of what those facts indicate, and the best way to improve the situation represented by those facts. Simply put, the logic of the principle of confidentiality in the peer review context does not require construing the limits of the privilege to cover

any and all factual material that is assembled at the direction of a peer review committee. See *id.*

In the context of the circumstances in the case at bar, it is true that Westgate's peer review committee could not effectively do its work without collecting basic information about the various incidents and accidents that occur at a nursing home. However, it is not the existence of the facts of an incident or accident that must be kept confidential in order for the committee to effectuate its purpose; it is how the committee discusses, deliberates, evaluates, and judges those facts that the privilege is designed to protect. We conclude that in order to effectuate other purposes outlined in the Public Health Code—especially those involving licensing—the statutory peer review privilege outlined in subsection 21075(8) is not undermined by administrative rules requiring a nursing home to keep and make available for review and copying incident reports and accident records that contain basic factual material but do not require the reporting of the internal deliberative process of a peer review committee.[12]

The question then becomes whether the information required by Rule 1104 implicates the deliberative review process. For six of the seven subsections—a-e

---

[12] *Dye* involved MCL 333.21513(d), which specifically commands the creation of a peer review body concerned with evaluating hospital practices. A similar command is not found for nursing homes. Further, MCL 333.21513(c) provides that a hospital "[s]hall assure that physicians and dentists admitted to practice in the hospital are granted hospital privileges consistent with their individual training, experience, and other qualifications." Thus, article 17 specifically commands that hospitals review the records at issue in *Dye* when evaluating not only if a physician will be given staff privileges, but the level of privileges that should be extended. There is no similar directive in the statutes applicable to nursing homes regarding I & A reports.

and g—the answer is apparent. These six subsections only seek factual information surrounding the occurrence of an incident or accident, as well as limited information about the health care response to it. Subsection f is the only requirement that comes close to impinging on the deliberative process. However, the mere fact that corrective measures have been taken for an individual occurrence does not necessarily encroach upon the decisions regarding broad issues of concern in resident care. Subsection f does not seek information about the manner in which the committee made the decision to implement the corrective action or the conclusions that it reached. Rather, it simply asks for a report of the concrete actions taken, if any, to address the singular event.

If the MDCIS identifies a particular problem at a facility through its own independent observations and discussions with staff and patients, then the I & A reports will be able to show if the problem is long-standing and what actions were taken to remedy the situation. The state's ability to accurately identify the number of incidents and accidents and relevant facts, like the time of occurrence, is essential to determining if residents are being provided the appropriate care and services. In a facility like a nursing home, where the number of such incidents could be quite high, the state should not be forced to rely on the memories of staff and residents to correctly identify these occurrences and any trends that they indicate.

The record before us does not contain the I & A reports at issue, but plaintiff argued below that the report concerning deficiency F-224 contained in the August 13, 1999, Statement of Deficiencies is a "verbatim recitation[]of the . . . [I & A report], including

the follow-up recommendations and the corrective actions (listed as preventive actions) taken by the facility." Accordingly, we turn to the F-224 deficiency report contained in that Statement of Deficiencies.

The F-224 report focuses on residents of Westgate's Dementia Unit. It begins with the following conclusory statement: "Based on observations, interviews and record review, it was determined that the facility failed to implement policies and procedures that prohibited neglect of 9 of 10 residents . . . reviewed for neglect out of a sample of 12 residents." A review of the report clearly shows that it is not simply a recitation of Westgate's I & A reports. Rather, these reports are integrated into the discussion, which includes the observations of the surveyors, as well as accounts of interviews with staff members.

Indeed, the report begins with an account of a surveyor's observations made on August 11, 1999, at 9:05 A.M. The report describes the interactions of four residents of the unit, and further notes the absence of any staff to intercede. Next, the report recounts events occurring on August 12, 1999, at 9:15 A.M, between a fifth resident and one of the residents observed the previous day. "At that time," the report continues, "the surveyor expressed concern to the staff in charge of the unit concerning safety of residents and monitoring residents . . . ." A subsequent interview with two staff members who also expressed concerns over staffing follows. The report continues:

On 8/12/99 at 9:45 A.M. subsequent to the meeting with staff in charge of the unit, concern was expressed to the administrator and director of nursing concerning safety of residents and monitoring residents especially the 5 afore-

mentioned residents all of whom are documented to be combative and / or physically abusive. After discussion concerning incident / accident reports, the incident / accident reports for the aforementioned residents were obtained for a time period following the last annual survey of 5/28/99. These are discussed concerning each resident after a review (below) of their records to indicate the seriousness of the situation.

Regardless of concern expressed concerning supervision of the unit and mention of the observed incidents recorded above . . . , it was observed on the Alzheimer's Unit there was only 1 aide on the unit to do care and monitor the residents' behavior.

It is in this context that the I & A reports are incorporated into the F-224 report. They do not serve as the sole basis for the deficiency cited, but instead are offered as further support for the conclusion that the unit is seriously understaffed. One I & A report reads as follows:

1) On 6/2/99, this resident was found at 12:15 A.M. out in the courtyard (patio) sitting on the sidewalk. He had received scrapes to :

A. The right outer elbow (3.7 cm by 2.4 cm),

B. Right outer ankle (1 cm by 1.5 cm),

C. Right hand 2nd knuckle (P.2 cm by 0.1 cm); and

D. Right Pinky finger (P.3 cm by 0.2 cm).

Follow-up Recommendations (FR): Need Door alarm fixed. Doesn't work was checked / check more often.

Preventative Actions (PA): There was need for a light in the courtyard (patio) in back.

We do not believe that disclosure of this information invades upon the deliberative process of Westgate's Leadership Council. All it indicates is the basic facts around an event occurring a little over two months before the revisit survey. The details of the event,

including the precise measurement of injuries and the time of the event, are not the type of information that would likely be readily available upon interview of the staff months later. The follow-up recommendations and preventive actions mentioned are occurrence specific and do not include any discussion of identifiable trends and problems, nor do they reveal any conclusions about, or a plan of action implemented to deal with, such trends and problems.

These reports are also essential to evaluating the response of the facility to the specific incident. The follow-up recommendation for the above incident was to fix the door alarm, apparently to alert staff when a resident wanders out into the courtyard in the middle of the night; the preventive action identified the need for a light in the courtyard. However, during follow-up interviews done with staff, the surveyor notes that "it was reported there was no light in the court-yard/patio (previously and currently) and that residents were allowed to wander out there with no supervision during the night." Thus, this I & A report gives the factual predicate to evaluate whether the facility was following through on its own responses to the event described.

Other I & A reports quoted in the discussion of the F-224 deficiency concluded with these follow-up recommendations and preventive actions: "PA: Monitor for unsteady gait," "PA: Assist as needed with ambulation," "PA: . . . Check more often," "FR: Observe for unsteady gait," "FR: Monitor resident location every 30 minutes," "FR: Monitor more often," "PA: Make sure bilateral shoes on when up. Check on more," "FR: Monitor resident closely," "PA: Check resident more frequently," "PA: Lock Bed—observe more

often," and "FR: Check for unsteady gait," There are many more of these types of recommended actions, all of which implicate the issue of staffing. Yet, when the revisit survey was done, the Dementia Unit was still understaffed. Indeed, many of the listed incidents and accidents occurred at a time when the unit was staffed with only one individual.

Again, we do not believe that disclosure of these individual I & A reports themselves would negatively affect the peer review process.[13] Each one simply contains basic information about an occurrence at the facility and how it was handled. It is not the information in any of these individual I & A reports that is damaging to the facility, but the pattern they establish, the staffing problem they indicate, and the lack of adequate response implied. Identifying this pattern is essential to the licensing and certification process, as well as, most importantly, to the well-being of Westgate's residents.[14]

Centennial next argues that the trial court erred in not considering evidence regarding the effect the disclosure of the I & A reports would have on Westgate's peer review process, or on the issue of the necessity of accessing this material. We disagree.

---

[13] To the extent that a nursing home's I & A documents might also include material that could be characterized as part of the deliberative process of the facility's peer review committee, the I & A documents should be reviewed by a court in camera, with any privileged material being redacted. No such review was requested by Centennial.

[14] There is nothing in the plain language of subsection 20175(8) limiting application of the privilege to civil litigation. Subsection 20175(8) unambiguously states that the identified information is "confidential" and "are not public records." It does not situationally limit this blanket declaration of confidentiality by indicating that the identified items/information is confidential only for purposes of civil litigation, nor does it qualify the declaration that this information is not a public record.

In essence, Centennial is asking this Court to reconsider a public policy decision already addressed by the Legislature. Subsection 20175 shows a public policy of encouraging health care professionals to engage in candid self-analysis and open discussions in order to safeguard and improve the quality of patient care in a health care facility. See *Bruce, supra* at 169-170. In order to safeguard against the potential chilling effect that public disclosure of peer review material would have on this self-monitoring, the Legislature has established a statutory guarantee of confidentiality. However, in order to assure that the peer review privilege does not overwhelm other important public policy concerns—such as assuring an effective licensing and certification process—the Legislature has defined the scope of the privilege in terms of the function of a peer review committee. In other words, the Legislature has directed a reviewing body to consider whether a document satisfies this definition, not an analysis case by case of whether disclosure of the document will have a chilling effect on a particular facility's peer review process. The effect is presumed if the document satisfies the criteria. There exists no statutory "back door" into the privilege if a facility is able to successfully argue that, in its particular case, disclosure of a given document that does not satisfy the definition of peer review material would undermine its particular peer review process.

We also do not believe that summary disposition was inappropriate because a factual record on the issue of "necessity" needed to be developed. In support of this assertion, plaintiff relies on the introductory portion of Rule 1101, which reads: "All of the following records shall be kept in the home and shall be

available to the director or his or her authorized representative for review and copying if necessary." We do not read this passage as establishing a burden of proof that must be satisfied when a request is made for the material sought in the case at bar. Unlike patient records, review of this basic factual material does not implicate other potential privileges, nor is it an unusual step in the survey process that needs to be carefully monitored in order to prevent abuse. In this case, where the statutory peer review privilege does not apply because the I & A reports do not satisfy the statutory definition of peer review material, there is nothing preventing the MDCIS from reviewing or copying this material in furtherance of promoting an effective survey of Westgate.

Finally, Centennial argues that the circuit court erred in concluding that it lacked subject-matter jurisdiction because the substantive basis of Centennial's complaint arises under federal law. This misstates the holding of the circuit court. The court's holding regarding subject-matter jurisdiction was limited to the issue of retaliation. It did not encompass the state law issues, which the circuit court correctly recognized were within its jurisdiction.[15] We conclude that the court was correct in finding that the issue whether the survey results and subsequent remedies were retaliatory was beyond its jurisdiction. Unlike the interpretation of state statutory law, a challenge to the validity of the findings and remedies imposed arises under the Medicare Act, and thus is uniquely

---

[15] The substantive basis of Centennial's claim was not the Medicare Act, nor was its claim "inextricably intertwined" with a claim for Medicare benefits. See *Heckler v Ringer*, 466 US 602, 614; 104 S Ct 2013; 80 L Ed 2d 622 (1984).

within the expertise of the HHS. *Heckler v Ringer*, 466 US 602; 104 S Ct 2013; 80 L Ed 2d 622 (1984).

Affirmed.