698 N.W.2d 892 (2005)
266 Mich. App. 39
In re ESTATE OF Max D. EGGLESTON, a Legally Incapacitated Person.
Maxanne Taverniti, Guardian and Conservator of Max D. Eggleston, Petitioner-Appellant,
v.
Patricia A. Gorski, Personal Representative of the Estate of Florence L. Downs, Deceased, Respondent-Appellee.
Docket No. 249957.
Court of Appeals of Michigan.
Submitted November 10, 2004, at Lansing.
Decided April 28, 2005, at 9:05 a.m.
Released for Publication June 22, 2005.
*894 Wilson, Lawler & Lett, PLC (by R. David Wilson), Lansing, for the petitioner.
Fraser Trebilcock Davis & Dunlap, P.C. (by Graham K. Crabtree and John S. Smith), Lansing, for the respondent.
Before: DONOFRIO, P.J., and MARKEY and FORT HOOD, JJ.
PER CURIAM.
Petitioner, Maxanne Taverniti, appeals as of right the probate court's denial of the request for election of the surviving spouse. MCL 700.2202. Petitioner, the daughter, guardian, and conservator for Max D. Eggleston ("Max"), a legally incapacitated person, sought the election against the estate of Max's deceased wife, Florence L. Downs Eggleston. Respondent, the personal representative of the estate of Florence L. Downs Eggleston, opposed the petition, asserting that the probate court was required to determine the propriety of the election and there were sufficient resources available to Max such that election was unnecessary. After *895 an extensive evidentiary hearing, the probate court denied petitioner's request to exercise the election and further concluded that the statutory requirement, that the court determine the election for a legally incapacitated person, was constitutional. We affirm.
Max D. Eggleston and Florence L. Downs Eggleston were married in 1999. In June 2002, Max Eggleston suffered a series of four strokes within a short time. Following the strokes, Max was paralyzed on his left side. As a result of the strokes and long-term alcohol use, he was also diagnosed with dementia. Florence and her daughter, Patricia Gorski, selected a nursing home facility to which Max was transferred. On July 24, 2002, Florence died. Florence's last will and testament was dated July 27, 1990, so it did not provide for Max, whom she married in 1999.
In the fall of 2002, Max was diagnosed with lung cancer. At the time of diagnosis, he was in the second of three stages of lung cancer. The lung cancer was inoperable, and he was not receiving treatment for the disease.
Petitioner Taverniti testified during her deposition that following Max's stroke, she began to collect assets, determine property ownership, and to calculate current and future expenses. Taverniti delineated the properties owned, the costs associated with maintaining the properties, and her attempt to sell property. Although Max owned three vehicles, he was no longer able to drive. Taverniti sold two of Max's vehicles. When examining Max's paperwork, Taverniti discovered the pension plan from Max's employer. She was able to draw from that account, but was running out of financial resources. When the funds were completely drained, Max would have to rely on Medicaid. Taverniti denied any contention that Max was under hospice care and denied that she was given any prognosis regarding Max's remaining life span.[1]
Kimberly Cosgrove, a certified public accountant, the granddaughter of decedent Florence, and an heir based on Florence's will, acknowledged that Max's expenses exceeded his monthly income. But Cosgrove testified that federal and state taxes were being paid when the generated income amount was insufficient to require the payment of taxes. Cosgrove also testified that the real property should be sold to eliminate utility and maintenance costs, but that Max's assets currently were sufficient to provide for his care for 19.43 months without the sale of any assets. However, if assets were sold, Cosgrove testified that there were sufficient resources to care for Max for 53 months.
Douglas Guy Chalgian, a self-employed attorney, testified that he examined the resources available to Max and the figures prepared by Cosgrove. Chalgian opined that the resources from Max's assets were sufficient to meet his needs. He testified that the resources were modest, the life expectancy was limited, and the use of available resources to pay for Max's care was appropriate. Chalgian opined that, for estate planning, he would recommend that Max prepay for his funeral. He further opined that if additional money were funneled into Max's estate, it would likely pass to his heirs.
Max was treated at the Dimondale nursing home by Dr. Fred Isaacs. Dr. Isaacs *896 had treated Max during the year after his admission to the nursing home. Max could not function independently because he had limited cognitive function. On the basis of the history he received, Dr. Isaacs opined that Max suffered from dementia, a gradual decline in thought processes as a result of excessive alcohol consumption or Alzheimer's disease. Dr. Isaacs opined that Max could not live alone, but that he could probably reside in an assisted living facility if the administration of his medication was supervised. Max could not provide for his own clothing, food, and shelter, but did not necessarily need daily nursing care. Max suffered from high blood pressure and lung cancer. The lung cancer was diagnosed beyond the first stage, when it was not surgically treatable. In fact, Max was not receiving any treatment for the lung cancer. Dr. Isaacs estimated on the basis of Max's medical conditions that Max had a reasonable life expectancy of six months to two years.[2]
Petitioner submitted a life expectancy table prepared by the Internal Revenue Service in July 2002. According to this chart, a seventy-three year old had an estimated 14.8 years of life remaining. Consequently, petitioner alleged that this information was sufficient to determine that Max's election as the surviving spouse was necessary because his estate did not have the resources required to maintain his nursing home expenses. Petitioner strenuously objected to the admission or consideration of any evidence to the contrary, arguing that the life expectancy tables took into account variations for illness and that Dr. Isaacs's testimony regarding life expectancy was inadmissible as speculation.
Following the evidentiary hearing, the probate court denied the request for election of surviving spouse brought by petitioner, stating:
In order to allow that the spousal elections be exercised, the Court must find that exercise of the elections [sic] are necessary to provide adequate support for the legally incapacitated individual during that person's life expectancy. The issue of the life expectancy is contested. The Conservator insists that the life expectancy tables should be followed. The life expectancy tables are averages that take into account the fact that some people die early and some people exceed normal life expectancy. Ms. Gorski [Respondent], on the other hand, contends that Mr. Eggleston's actual life expectancy [should] be taken into account. The Court believes that the life expectancy tables should be used only when there is no evidence offered as to actual life expectancy. The testimony indicated that Mr. Eggleston has lung cancer, which is not treatable. Dr. Isaacs testified that Mr. Eggleston's life expectancy, giving [sic] his current state of health, is anywhere from six months to two years. In addition, the cash flow projection admitted as Exhibit 4 indicated that Mr. Eggleston would have sufficient assets to support him through his life expectancy. The Court finds, therefore, that exercise of the elections is not necessary to provide adequate support for Mr. Eggleston during his life expectancy. Therefore, the Motion to Elect Decedent's Estate is denied.
The probate court also rejected the contention that the statute at issue, MCL *897 700.2202, was unconstitutional, concluding that there was a rational basis for the conditions placed on an election by a legally incapacitated person as opposed to other surviving spouses.[3]
Petitioner first alleges that the probate court abused its discretion by failing to allow the election. We disagree. MCL 700.2202 addresses the election of the surviving spouse and provides, in relevant parts:
(2) The surviving spouse of a decedent who was domiciled in this state and who dies testate may file with the court an election in writing that the spouse elects 1 of the following:
(a) That the spouse will abide by the terms of the will.
(b) That the spouse will take 1/2 of the sum or share that would have passed to the spouse had the testator died intestate, reduced by ½ of the value of all property derived by the spouse from the decedent by any means other than testate or intestate succession upon the decedent's death.
* * *
(5) In the case of a legally incapacitated person, the right of election may be exercised only by order of the court in which a proceeding as to that person's property is pending, after finding that exercise is necessary to provide adequate support for the legally incapacitated person during that person's life expectancy.
Issues of statutory construction present questions of law that are reviewed de novo. Cruz v. State Farm Mut. Auto. Ins. Co., 466 Mich. 588, 594, 648 N.W.2d 591 (2002). The goal of statutory construction "`is to discern and give effect to the intent of the Legislature'" by examining "`[t]he most reliable evidence of its intent,'" the words of the statute. Neal v. Wilkes, 470 Mich. 661, 665, 685 N.W.2d 648 (2004) (citations deleted). If the statutory language is unambiguous, appellate courts presume that the Legislature intended the plainly expressed meaning, and further judicial construction is neither permitted nor required. DiBenedetto v. West Shore Hosp., 461 Mich. 394, 402, 605 N.W.2d 300 (2000). When a term is not defined by statute, an appellate court may turn to dictionary definitions to construe the term in accordance with its plain, ordinary, and generally accepted meaning. In re Certified Question (Kenneth Henes Special Projects v. Continental Biomass Industries, Inc.), 468 Mich. 109, 113, 659 N.W.2d 597 (2003). "[F]actual findings made by a probate court sitting without a jury are reviewed for clear error." In re Seymour Estate, 258 Mich.App. 249, 255 n. 5, 671 N.W.2d 109 (2003). However, "application of the law to the facts is reviewed de novo." Centennial Healthcare Mgt. Corp. v. Dep't of Consumer & Industry Services, 254 Mich.App. 275, 284, 657 N.W.2d 746 (2002).
Where a dispute exists regarding the health of a person whose life expectancy is in issue, the mortality tables are admissible. Jenkins v. Canfield, 282 Mich. 277, 280-281, 276 N.W. 447 (1937). But the trier of fact may or may not use the mortality tables depending on the disposition of the disputed question of fact. Id.
*898 In the present case, Max is a legally incapacitated person. Consequently, the right of election may only be exercised by probate court order "after finding that exercise is necessary to provide adequate support for the legally incapacitated person during that person's life expectancy." MCL 700.2202(5) (emphasis added). The term "that," as an adjective, is "used to indicate a person or thing as pointed out or present, mentioned before, supposed to be understood, or by way of emphasis...." Random House Webster's College Dictionary (2001). The use of the adjective "that" before the phrase "person's life expectancy" signifies that the Legislature intended the actual circumstances surrounding a specific individual to be considered when evaluating the projected life expectancy. Thus, the use of the term "that" modifies the statutory provision to reflect its consideration of the individual at issue. Consequently, when specific information regarding the health and life expectancy of the legally incapacitated person is available, the trier of fact may properly consider the evidence, and the trier of fact resolves the factual issues surrounding the use of the mortality tables. Jenkins, supra at 281, 276 N.W. 447.
In the present case, the probate court was presented with the available medical information, the resources available, and the options should the financial resources be depleted. Although the life expectancy tables indicated that a seventy-three-year-old man could live an additional 14.8 years, the table did not reflect the individual circumstances surrounding Max, this particular legally incapacitated person. Unfortunately, Max was diagnosed with inoperable lung cancer, so he did not receive treatment for the disease. Additionally, Max suffered from paralysis and dementia as a result of his strokes and alcohol use. There was no indication that he would improve, and the prognosis involving his individual circumstances was that he would survive for six months to two years. Under the circumstances, we cannot conclude that the probate court's factual findings were clearly erroneous. Seymour, supra. The trier of fact, when presented with the circumstances of this individual's life expectancy, concluded that the medical information indicated the need to consider specific factors as opposed to merely following the standard life expectancy tables. Jenkins, supra. The evidence indicated that the resources currently and potentially available were adequate to provide for Max during his lifetime. Indeed, there was testimony that if respondent transferred assets to Max, it could result in a windfall to Max's heirs. Therefore, the probate court did not err.
Although not raised in the statement of questions presented, petitioner asserts that it was erroneous to admit the testimony of Dr. Isaacs because it was based on sheer speculation. Dr. Isaacs admitted that he was not an oncologist. However, Dr. Isaacs was Max's treating physician in the nursing home. Dr. Isaacs was well aware of the status of Max's cancer. He knew that the cancer was inoperable and that Max was not receiving any treatment for the disease. On the basis of his experience in treating patients with this illness, Dr. Isaacs estimated Max's life expectancy to the best of his medical ability under the circumstances. We cannot conclude that the admission of this testimony was an abuse of discretion. Davidson v. Bugbee, 227 Mich.App. 264, 266, 575 N.W.2d 574 (1997); MRE 701.
Petitioner further alleges that MCL 700.2202(5) is unconstitutional because it treats legally incapacitated individuals differently from other individuals. That is, without a rational basis, the statute allows individuals to be treated differently when the probate court renders the decision for a legally incapacitated individual *899 while an individual who is not incapacitated can automatically make the election without judicial supervision or interference. We disagree. We review de novo constitutional challenges. Wayne Co. v. Hathcock, 471 Mich. 445, 455, 684 N.W.2d 765 (2004). The statute at issue is reviewed pursuant to the rational basis test.[4] A review pursuant to the rational basis standard does not examine "the wisdom, need, or appropriateness of the legislation." Muskegon Area Rental Ass'n v. City of Muskegon, 465 Mich. 456, 464, 636 N.W.2d 751 (2001) (citation deleted). Furthermore, it does not test whether the classification is made with mathematical nicety or whether some inequity is placed into practice. Id. Rather, the only inquiry or test is "whether the legislation is reasonably related to a legitimate governmental purpose." TIG Ins. Co. v. Treasury Dep't, 464 Mich. 548, 557, 629 N.W.2d 402 (2001). Constitutional review is upheld "`if the legislative judgment is supported by any set of facts, known or reasonably assumed, even if the facts are subject to debate.'" Id., quoting Crego v. Coleman, 463 Mich. 248, 260, 615 N.W.2d 218 (2000). A challenge to the rational basis of the statute "`must overcome the presumption that the statute is constitutional.'" Muskegon, supra at 464, 636 N.W.2d 751, quoting TIG, supra at 557-558, 629 N.W.2d 402. To succeed in having legislation stricken, the petitioner must establish that the legislation is based on reasons totally unrelated to the state's goals. Id. This burden is extremely high because the challenger must negate every conceivable basis that would support the legislation. Id.
In the present case, petitioner has failed to meet her burden of overcoming the presumption that the statutory provision is constitutional. The legislation at issue is reasonably related to a legitimate governmental purpose. It acknowledges the difference in motivation and theory for the election by the surviving spouse in the context of a legally incapacitated person. That is, in the case of a legally incapacitated person, the petitioner may be motivated by personal gain as opposed to the needs of the legally incapacitated person. Consequently, the Legislature has provided that the probate court makes the election. Indeed, in Vanderlinde v. Bankers Trust Co., 270 Mich. 599, 606-607, 259 N.W. 337 (1935), the Supreme Court noted the rational for this provision:
But in no case discovered has an election for an incompetent wife been permitted by any one except the court, which is not her representative but stands in her place. The reason is plain. Election by order of the court and by representatives or heirs would proceed upon different theories. In the former, the interests of the wife herself, but consideration of the rights of others, are the governing factors. In the latter, personal and selfish interests naturally predominate.
Thus, in the present case, the probate court was presented with evidence that the resources available and the subsequent liquidation of Max's assets were sufficient to maintain Max's care during his lifetime. Further, the probate court was presented with evidence that funneling additional money into Max's estate could merely result in a windfall to Max's heirs. Thus, the *900 legislation treating legally incapacitated individuals differently is designed to ensure that financial decisions are made with regard to need and adequacy and that they are not tainted by improper financial motive. The probate court properly determined that the statute at issue is constitutional.
Affirmed.
NOTES
[1] Taverniti was deposed in Williamsburg, Virginia, and counsel for respondent was not present for the deposition. Taverniti did not testify at trial. Her deposition testimony was admitted despite the objection by respondent. This evidentiary ruling is not challenged on appeal.
[2] We note that there is reference to additional testimony that was not provided with the record on appeal. Specifically, there is an indication that "Sister May Kay Gruin" testified on April 4, 2003. However, that transcript has not been presented on appeal. It was the duty of petitioner, as the appellant, to provide a full record on appeal. See Band v. Livonia Assoc., 176 Mich.App. 95, 103-104, 439 N.W.2d 285 (1989).
[3] We note that there were two underlying probate proceedings. This litigation was presented to the Eaton County Probate Court, while the probate of the decedent's will occurred in the Clinton County Probate Court. The parties do not raise any issues with regard to the Clinton County Probate Court, despite the fact that allowances were paid in the Clinton County Probate Court proceeding. Accordingly, we do not consider any issue with regard to the Clinton County Probate proceeding.
[4] When a challenge is based on the Equal Protection Clause, U.S. Const, Am XIV, the challenge is reviewed under the "strict scrutiny" test when the law addresses suspect classifications such as race, national origin, or ethnicity. Muskegon Area Rental Ass'n v. City of Muskegon, 465 Mich. 456, 463, 636 N.W.2d 751 (2001). An intermediate or heightened scrutiny level of review applies to categories such as illegitimacy and gender. Id. at 464, 636 N.W.2d 751. The rational basis test applies when the other categories are not implicated. Petitioner does not dispute that the rational basis test applies.