HARRISON v MUNSON HEALTHCARE, INC

Docket Nos. 304512 and 304539. Submitted January 8, 2014, at Lansing. Decided January 30, 2014, at 9:00 a.m. Leave to appeal sought.

Jeanne Harrison brought an action in the Grand Traverse Circuit Court against Munson Healthcare, Inc., William P. Potthoff, M.D., and others, seeking damages for injuries sustained when an electrocautery device burned her forearm during thyroid surgery performed by Potthoff at Munson Medical Center. Munson insisted throughout discovery that no one who had been in the operating room remembered the incident. During their depositions, the operating room personnel stated that the device was always returned to its protective holster when not in active use. Munson contended that, given this habit and practice and the absence of any memories of the event, only an accidental dislodgment of the device from its holster could explain the burn. During trial, testimony revealed that an "incident report" had been created within 90 minutes of the burn that stated that a holster for the device had been available but had not been used. The court, Philip E. Rodgers, Jr., J., ordered Munson to produce certain files and notes for in camera review. Following its review, the court declared a mistrial, noting its concerns about ethical considerations arising from defendants' presentation of a defense inconsistent with the incident report. The court then conducted an evidentiary hearing regarding defendants' claim that the documents reviewed in the in camera hearing were peer-review documents exempt from disclosure. The court thereafter issued an opinion ruling that the documents were privileged. The court also held that counsel for Munson, Thomas R. Hall, had violated MRPC 3.1 and 3.3 by offering a defense that was inconsistent with known but undisclosed facts. The court additionally held that Hall and Bonnie Schreiber, Munson's risk manager, had violated MCR 2.114(D)(2) by filing documents that were not well grounded in fact. The court assessed Munson and Hall $53,958.69 in sanctions, jointly and severally. The court then denied defendants' motion for reconsideration and Harrison's motion for additional sanctions. Munson appealed and Harrison cross-appealed. (Docket No. 304512). Hall appealed. (Docket No. 304539). The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. Whether a particular document qualifies as privileged under MCL 333.21515 depends on the circumstances surrounding its creation.

2. The peer-review-privilege statutes exempt from disclosure the records, data, and knowledge collected for or by individuals or committees assigned a professional review function. Mere submission of information to a peer-review committee does not satisfy the collection requirement. MCL 333.20175(8) and MCL 333.21515 shield from disclosure materials accumulated for study by individuals or committees assigned a professional review function. Objective facts gathered contemporaneously with an event do not fall within the definition of "collect."

3. Given the evidence that Munson's quality committee does not collect or review accident reports, that incident reports are stored within the risk-management department and are not provided to peer-review committees for study, and that no peer-review file was ever created concerning Harrison's burn, it can be concluded that the factual information recorded on the first page of the incident report was not immune from disclosure as material collected pursuant to MCL 333.21515. The trial court erred by determining that that portion of the report, which contained a nurse's handwritten operating room observations, was privileged. The remainder of the incident report reflects a deliberative review process. The trial court correctly concluded that that portion of the incident report qualified as confidential.

4. The trial court did not clearly err by finding that a surgical participant laid the device on the surgical drape (accidentally, negligently, or deliberately) and that that person, or another person in the room, negligently failed to holster it.

5. Munson's conduct in creating an accident defense scenario despite its possession of direct evidence contrary to that position was a violation of MCL 600.2591(3)(a)(*ii*), which prohibits a party from advancing a claim or defense when the party has no reasonable basis to believe that the facts underlying that party's legal position are in fact true. The trial court did not abuse its discretion by finding that Munson invoked MRE 406 in bad faith by introducing habit-and-practice evidence to prove conformity of conduct despite that the evidence known only to Munson soundly contradicted that defense. The trial court's determination that defendants' conduct contravened MCR 2.114 fell within the range of reasonable and principled outcomes. The imposition of sanctions was not an abuse of discretion.

6. The trial court's determinations that Hall violated MCR 2.114 and MRPC 3.1 are affirmed. Hall's acquiescence in presenting certain testimony despite his awareness that the incident report substantially contradicted many of the statements in the testimony, suffices to establish an ethical violation under MRPC 3.3(a)(3).

7. The trial court erred by failing to render separate sanctions awards. Given the limited time Hall had access to the incident report, his culpability is far less than that of Munson. There is no merit to Harrison's claim for additional sanctions.

8. The award of sanctions is affirmed and the case is remanded for individualized assessments against Hall and Munson. On remand, Munson may elect to take full responsibility for the sanctions award. If Munson chooses not to do so, the trial court must conduct a hearing to clarify Hall's personal liability for the amounts awarded. Hall may not be sanctioned for costs or fees that arose before the date he was provided the incident report.

Affirmed and remanded.

1. HOSPITALS — PEER-REVIEW COMMITTEES — DISCLOSURE OF COMMITTEES' RECORDS, DATA, AND KNOWLEDGE.

Hospitals are required by MCL 333.21513(d) to establish peer-review committees whose purposes are to reduce morbidity and mortality and to ensure quality care; to encourage candid, thorough peer-review assessments of hospital practices, the Legislature has shielded peer-review activities from intrusive public involvement and from litigation; the records, data, and knowledge collected for or by individuals or committees assigned a review function are confidential and are to be used only for the purposes provided in Article 17 of the Public Health Code, are not public records, and are not available for court subpoena (MCL 333.21515).

2. HOSPITALS — PEER-REVIEW COMMITTEES — DISCLOSURE OF DOCUMENTS.

Whether a particular document qualifies as privileged from disclosure under MCL 333.21515 depends on the circumstances surrounding its creation; factual information objectively reporting contemporaneous observations or findings are not privileged while records, data, and knowledge gathered to permit an effective review of professional practices may be privileged.

3. HOSPITALS — PEER-REVIEW COMMITTEES — DISCLOSURE OF INFORMATION COLLECTED FOR REVIEW.

The records, data, and knowledge collected for or by individuals or committees assigned a peer-review function described in Article 17

of the Public Health Code are confidential and may be used only for the purposes provided in Article 17, are not public records, and are not available for court subpoena; in determining whether any of the information requested is protected by the statutory privilege, the trial court should bear in mind that the mere submission of information to a peer-review committee does not satisfy the collection requirement so as to bring the information within the protection of the statute (MCL 333.21515).

*Thomas C. Miller* for plaintiff.

*Fraser Trebilcock Davis & Dunlap, PC* (by *Graham K. Crabtree*), for Munson Healthcare, Inc.

*Hall Matson, PLC* (by *Marcy R. Matson*), for Thomas R. Hall.

Before: OWENS, P.J., and BORRELLO and GLEICHER, JJ.

GLEICHER, J. Plaintiff, Jeanne Harrison, sustained a quarter-sized forearm burn during thyroid surgery performed by defendant Dr. William Potthoff at Munson Medical Center, owned by defendant Munson Healthcare, Inc. Postoperatively, Harrison met with a Munson representative to learn the cause of her burn. The representative told her that an electrocautery device called a "Bovie" had created the wound but offered no additional details. Dissatisfied with that answer and unhappy about the burn's aftereffects, Harrison filed suit.

Munson insisted throughout discovery that no one in the operating room remembered the incident, that the burn's mechanism "may not be ascertainable and may not ever be known," and that the witnesses lacked "any way of knowing precisely when or how the burn occurred." During their depositions, the operating room personnel avowed that they always returned the Bovie to its protective holster when it was not in active use. Munson contended that given this habit and practice

and the absence of any memories of the event, only an accidental dislodgement of the Bovie from its holster could explain the burn.

At the trial, Munson's operating room manager revealed that it would have been her practice to interview "every single staff member in [the operating] room" following an untoward event such as Harrison's burn. Subsequent inquiry revealed that within 90 minutes of the burn, a nurse penned an "incident report" stating: "During procedure, bovie was laid on drape, in a fold. Dr. Potthoff was leaning against the patient where the bovie was." The operating room manager's investigation yielded a conclusion that the Bovie's holster "was on field for this case, however bovie was not placed in it." The trial court perceived that this information directly contradicted the defense's contentions that no one knew how the event had occurred and that the Bovie had inadvertently fallen on the patient and declared a mistrial.

At an ensuing evidentiary hearing the trial court explored whether the incident report was subject to the statutory peer-review privilege and whether Munson and its counsel, Thomas R. Hall, had diminished the integrity of the proceeding by pursuing a defense at odds with the facts known to Munson. Ultimately, the trial court found the incident report privileged from disclosure but nevertheless imposed a joint and several sanction of $53,958.69 on Munson and Hall. We affirm the sanction award but remand for an individual assessment of the sanctions owed.[1]

---

[1] Numerous documents and transcripts were sealed by the trial court and remain sealed on appeal. Because defendants have relied on, quoted, and attached selective portions of these materials to their public briefs, we have cited in this opinion the portions of the sealed materials utilized by defendants.

I. BACKGROUND FACTS AND PROCEEDINGS

A. PRETRIAL PROCEEDINGS

On April 24, 2007, Dr. Potthoff surgically removed Jeanne Harrison's cancerous thyroid gland. Richard Burgett, a certified surgical assistant employed by Munson, assisted Dr. Potthoff. The operative note states that when the operation was complete and the drapes removed, "[t]here was found to be a burn wound on the left forearm, evidently from the Bovie."[2] The note continued: "There was a burn on the drape during the case that was noticed and this was sterilely covered with sterile towel and the Bovie changed. At this point in time it became evident that the burn carried into the skin on the patient." No other notations in Harrison's medical record shed light on the burn's cause.

Soon after she recovered from the thyroid operation, Harrison sought more information from Munson about the genesis of her injury. On June 5, 2007, Harrison received a letter signed by Barbara A. Peterson, Munson's operating room manager. The letter stated, in relevant part:

> This case has been confidentially reviewed and the following initiatives have been reinforced: The mandatory and active use of cautery protective devices anytime cautery is used. In addition, we have mandated the use of an alarm that is audible every time the device is activated. These precautions will decrease the likeihood of a burn event reoccuring. We will continue to measure these practices to ensure 100% compliance.

Harrison then met with Bonnie Schreiber, Munson's risk manager, to further discuss the burn. Still dissatisfied, Harrison retained counsel.

---

[2] A Bovie is a pencil-shaped instrument used to cauterize bleeding tissue or to cut through tissue. A push button on the device triggers the flow of current, which heats the device's electrical tip.

In November 2008, attorney Thomas C. Miller filed a complaint on Harrison's behalf in the Grand Traverse Circuit Court. The complaint sounded in negligence, rather than in medical malpractice, and named as defendants Munson Healthcare, Inc., and Dr. Potthoff. Dr. Potthoff was not employed by Munson, and the parties agreed that he did not act as Munson's agent at the time of the surgery. Nevertheless, Munson and Dr. Potthoff agreed to a joint defense handled by Hall. Hall sought summary disposition of Harrison's negligence claim, averring that it sounded in malpractice. Judge Philip E. Rodgers, Jr., granted the motion.[3]

Harrison proceeded to comply with the statutory requirements governing medical malpractice actions by mailing Munson and Dr. Potthoff a notice of intent to sue pursuant to MCL 600.2912b. During the 182-day "waiting time" required by the statute, Hall provided Miller the names of the 11 people who had been in the operating room during Harrison's surgery, identifying Burgett as the surgical assistant. Miller then filed a lawsuit against Burgett and Munson, again alleging negligence rather than malpractice.[4] Burgett, represented by Hall, responded by filing an affidavit of noninvolvement pursuant to MCL 600.2912c, averring that he did not "use, hold, holster, or otherwise handle the Bovie device" during the surgery. The affidavit further provided:

---

[3] Before the action was dismissed, Miller sent Munson a request for production of documents pursuant to MCR 2.310, requesting among other things "All incident reports and witness statements covering the incident that occurred during surgery on April 24, 2007, which resulted in Mrs. Harrison sustaining a burn on her left arm from an activated electrocautery device." Munson did not respond to this request and Miller failed to resend it during the subsequent proceedings.

[4] Because Burgett is an unlicensed health professional, Harrison argued that the notice of intent to file suit and affidavit of merit requirements of MCL 600.2912b and MCL 600.2912d(1) did not apply to him.

5. Prior to the April 24, 2007 surgery, I have had occasion to assist Dr. Potthoff in numerous surgeries, estimated at several hundred. This would likewise include literally dozens of surgeries involving removal of the thyroid gland and/or surrounding tissue.

[6]. Throughout those occasions upon which I have assisted Dr. Potthoff during surgery involving thyroid removal, it has never been my habit and/or custom to use, hold, holster, or otherwise handle the electrocautery (Bovie) device, at any time before, during or after surgery.

Judge Rodgers granted Burgett and Munson summary disposition, ruling that the case sounded in medical malpractice rather than simple negligence.

Harrison then filed this medical malpractice action, which also included a res ipsa loquitur claim. With her complaint, Harrison submitted affidavits of merit signed by a general surgeon and a nurse. The parties embarked on a lengthy and contentious course of discovery focused on establishing how the Bovie had ended up on the drape covering Harrison's arm and who—Dr. Potthoff or a Munson employee—was responsible for its presence there.

Harrison utilized interrogatories and requests for admission, supplemented with depositions, to develop her proofs. Early in the process, Harrison sought an admission that the "individuals who were responsible for the electrocautery device" were Munson employees acting in the course of their employment. If Munson denied this request for admission, Harrison demanded that Munson "please specifically identify the individual or individuals by name and position, who were responsible for the device burning Mrs. Harrison's arm." Munson responded:

Defendant objects to this request, in that it is vague, over broad and calls for a legal conclusion. Moreover, to the

extent that this request refers in any manner to Dr. Potthoff, it has never been established that he was acting as an agent of Munson Healthcare (either real or ostensible) at the time of these events. In further answer, discovery is in its early stages and Plaintiff's counsel will be afforded the right to depose all individuals present in the operative suite at the time of surgery, who may have knowledge concerning the means by which the injury occurred or may have occurred. Finally, Defendant relies upon the medical records from Mrs. Harrison's April 24, 2007 outpatient surgery at Munson.

In response to Harrison's inquiries regarding responsibility for the Bovie at the time of the burn, defendants repeatedly directed Harrison to the medical record and denied that anyone in the operating room possessed any memory of the circumstances surrounding the burn. According to an affidavit filed early in the litigation by circulating nurse Cinthia Gilliand, "the injuries allegedly sustained by Jeanne Harrison, in whole or in part, were caused by acts and occurrences outside the control of the surgical team[.]" Gilliand concomitantly averred that she possessed no memory of the surgery.

Based on the absence of any participant's memory about the cause of the burn, Munson and Potthoff advanced an accident defense. They contended that because Dr. Potthoff and the operating personnel always reholstered the Bovie after using it, the Bovie's cord likely became entangled in a suction line, which then pulled the Bovie from its holster. Defendants theorized that the unnoticed Bovie accidentally fired when someone leaned against it. In answer to one of Harrison's interrogatories, Hall described the defense as follows:

Defendants submit that a more fair description and/or plausible explanation of "how the burn occurred" is as follows: At some unknown point during surgery, the Bovie

device evidently became unholstered while Dr. Potthoff was moving in and about the patient and attending to her. This may in fact have resulted in the Bovie cord becoming tangled upon itself, or perhaps upon other equipment at the bedside and even upon the clothing of Dr. Potthoff. (This was explained, in part by Dr. Potthoff at deposition).

In any event, the Bovie apparently came to rest above the drape in the area of the patient's left arm, unbeknownst to the surgeon (Dr. Potthoff) and the remaining staff. From there, it appears most likely that the Bovie was inadvertently activated by Dr. Potthoff, as he leaned in toward the patient.

At his deposition, Dr. Potthoff denied any memory of the circumstances surrounding the burn, but opined that by virtue of the regular habits and practices of the surgical team, "we did everything possible to avoid such an injury." He insisted that because those in the operating room invariably reholstered the Bovie after each use, the burn qualified as accidental rather than a breach of the standard of care. Dr. Potthoff elaborated:

> The problem with the Bovie is it's attached to a cord which can get entangled, can get rubbed on, can get moved as people move around the table, as instruments get moved, as the suction, which is intimately connected to the Bovie in most cases, gets moved. The Bovie cord can get tangled up in all those things and get pulled out of the holster.[5]

Miller deposed most of the operating room witnesses and learned nothing new until the last two participants gave their testimonies. David Scott Babcock, a surgical technologist, and Ann Tembruell, a student technologist working under Babcock, remembered Harrison's surgery. Both recalled hearing an alarm signaling that

---

[5] The Bovie holster was attached to the operating room table near Harrison's chest area; no one could recall with certainty whether the holster was mounted on the patient's left or right side.

the Bovie was in use and simultaneously observing Dr. Potthoff without the Bovie in his hand. Babcock recounted that everyone immediately looked for the Bovie. Within seconds, someone found it on the drape overlying Harrison's arm. According to Babcock and Tembruell, Dr. Potthoff had activated the Bovie by leaning against it. Tembruell recalled stating aloud: "Dr. Potthoff, you're leaning against the Bovie. The Bovie has fallen," and that Dr. Potthoff "stepped back immediately."

### B. THE TRIAL

In his opening statement at the trial, Hall told the jury that Munson did not know how the burn happened and postulated that the likely mechanism was an "inadvertent unholstering of th[e] Bovie when the surgeon is in there doing his work." Dr. Potthoff declared during his testimony that when he dictated the operative report "I did not know how it occurred . . . I still don't know how it occurred." He admitted, however, that during his 30 years as a surgeon, this was the only "inadvertent[]" Bovie burn he could recall. Similarly, none of the other operating room participants recalled any other Bovie burn incidents.

According to Dr. Potthoff, the standard of care required that he and the other operating room personnel place the Bovie in its holster after use "[a]bsolutely every time." Dr. Potthoff refused, however, to take full responsibility for holstering the Bovie; he testified that Burgett always handled the Bovie during surgeries and had lied in his affidavit of noninvolvement by claiming otherwise. Nevertheless, Dr. Potthoff stressed, he "absolutely" did not believe that Burgett was "in any way responsible" for Harrison's burn.

Several other operating room witnesses testified that they had no memory of the surgery and denied having been interviewed by anyone about what had happened. Babcock and Tembruell testified consistently with their depositions, recounting the discovery of the Bovie after the alarm sounded. The parties presented nurse Gilliand's testimony by reading from a deposition taken 10 days earlier. In the following colloquy Gilliand addressed her memory of the surgery and her practice regarding chart notes:

*Q.* Now, have you ever been in a situation where you recall a specific incident were the Bovie burned a hole through the surgical drape? Has that ever happened in a procedure you've been involved in?

*A.* I'm told in this one, but I don't remember.

*Q.* All right. But—and I understand that you don't have a memory. That's why I'm saying do you ever remember in any time in your career, the 11 or 12 years that you've been working as a circulating nurse, where you've been part of a procedure where the Bovie did burn a hole in the drape?

*A.* No.

*Q. If that had happened while you were in the operating room is that something you would've written in the nurse's notes?*

*A. Yes.*

*Q. If after the sterile field was broken down following the closure, and it was determined at that point that Mrs. Harrison's arm had been burned by the Bovie, would that also have been something you would have normally recorded in that box?*

*A. Usually, yes.*

*Q.* And you have no memory of this happening in this case, true?

*A.* Correct.

> *Q. Has there ever been a procedure where you've been involved where the Bovie has inadvertently burned a portion of the patient's body?*
>
> *[A]. No.*

* * *

> *Q. And you've indicated that if something like that happened you would've made a note in the back, right-hand corner of the form, in the nurse's notes section, right?*
>
> *[A]. If that's something that would've happened, it's like the needle count being off, I would have documented it.*

* * *

> *Q. Do you know Barbara Peterson?*
>
> *[A]. She used to be the OR manager, yes.*
>
> *Q. In the six weeks after this procedure, do you recall having been contacted by Ms. Peterson about what took place during this procedure?*
>
> A. No. I do not remember anything like that. [Emphasis added.]

Despite professing no memory of the surgery, Gilliand insisted that she had accurately attested in her affidavit "that the entire surgical team, including myself, took all necessary and proper measures to check and otherwise use the Bovie device."

Harrison called Barbara Peterson, Munson's operating room manager, to testify concerning the letter she had signed and sent to Harrison. Munson claimed that Peterson's testimony was potentially privileged as peer review; accordingly, Judge Rodgers questioned Peterson outside the jury's presence. During Judge Rodgers's questioning, Peterson revealed that it would have been her practice "to talk to every single staff member in that room" before drafting the letter and expressed

confidence that she did so. In response to the trial court's question whether an incident report would have been prepared, Peterson was uncertain but stated that it would have been an appropriate action.

Noting the discrepancy between Peterson's claim that she would have interviewed those present during the surgery and the participants' denials that they had been interviewed, Judge Rodgers ordered Munson to produce for in camera review the risk manager's file and any notes that Peterson created. The next day, Hall provided an incident report authored by nurse Gilliand, who had denied under oath any memory of the event or of participating in a postoperative discussion about it.[6]

### C. THE IN CAMERA HEARING

The testimony in camera established that at 1:51 p.m. on the day of the surgery, Gilliand handwrote most of the first page of a multipage incident report. In a box labeled "WHAT happened?" Gilliand responded: "During procedure bovie was laid on drape, in a fold." Gilliand's note continued, "Dr. Potthoff was leaning against the [patient] where the bovie was." The event occurred "around" 12:20 p.m.

At the bottom of the report's second page, in a note dated 15 days later, Peterson handwrote: "Reviewed [at] Wed[nesday] inservice. Reviewed use of cautery safety devices. Use of these devices was made a 'Red Rule' resulting in disciplinary action if safety devices not used. *Bovie holder was on field for this case, however bovie was not placed in it.*" (Emphasis added.) A summary attached to the incident report concluded

---

[6] The parties have used interchangeably the terms "incident report" and "occurrence report."

that "Contributing Factor #1" to the injury was: "Failure to follow procedure/policy."

After reviewing the incident report in chambers, Judge Rodgers declared a mistrial. He ruled that an evidentiary hearing would be required to determine whether the incident report qualified as a peer-review-protected document and expressed that Munson had demonstrated "[a] shocking lack of candor" regarding the cause of Harrison's burn. Judge Rodgers continued:

> There is a concern the Court has to some degree of risk management claims, management has been dressed up as a peer review here. There are cases that have been provided to the Court by counsel for Munson that would suggest in some cases incident reports could be protected, that begs the question of whether you can have an incident report, know what occurred, not produce the report and then pretend like you don't know what occurred. That suggests to me to be sophistry. It may be that your internal work product isn't produced, but it doesn't, I believe, absent authority to the contrary allow someone whose [sic] conducted an internal investigation, taken information from witnesses, to then say we don't know. I just, I'm struggling with how that could possibly be true.
>
> Quite frankly, as I've gone through this I'm concerned at this particular time with the lack of candor from Munson. And, I am feeling a degree of the frustruation that Ms. Harrison must have with regard to how this case is unfolding. And, also, some degree of empathy for Dr. Potthoff, who appears to be standing off to the side of this entire maelstrom without anybody involving him. I don't see his fingerprints on this whatsoever, I want to be crystal clear about that.
>
> This appears to be a mountain that has been made out of a mole hill.

Judge Rodgers then expressed concern about "ethical considerations" arising from the presentation of a defense inconsistent with the "peer review materials." He

queried: "If there is no specific memory about what occurred, can one present an analysis of what might have occurred that's inconsistent with perhaps the peer review, can that even be done ethically[?]" Judge Rodgers concluded:

> So, at this particular time it appears to me that there has been, at the very least, a gross impropriety in the discovery process here. The Court believes that is a cause to miss-try [sic] the case.
>
> The Court believes an evidentiary hearing needs to be held with respect to these documents. . . .
>
> . . . Is this legitimate peer review, is this claims management dressed up as peer review. What can you know, and if you protect the documents, still not disclose. How can you defend a case, what are the ethical limitations with regard to what's in the peer review documents. There is [sic] some very serious medical, legal, ethical issues encompassed in what is fortunately for Ms. Harrison a scar on her arm and not a loss of a limb or operation of a wrong eye.

### D. THE EVIDENTIARY HEARING

Judge Rodgers introduced the evidentiary hearing by explaining that he intended "[t]o make a determination as to whether all, none, or part of the documents submitted to the Court are actually peer review documents." He continued: "And then, at least from this Court's point of view, perhaps most importantly, if in fact all or some of these documents are peer review, to discuss the ethical issues associated with presenting a defense which would appear to be inconsistent with those documents." Before the hearing testimony commenced, the parties acknowledged that Munson had admitted liability for the burn "in open court."[7]

---

[7] The parties have not provided this Court with a transcript of that admission. Munson subsequently settled Harrison's burn claim.

Paul Shirilla, Munson's vice president of legal affairs and general counsel, described at length the peer-review process utilized at Munson and the relationship of the incident report to that process. According to Shirilla, oversight for the peer-review process emanates from the board of trustees, which appointed the quality committee to review information submitted by other review committees. The quality committee does not review individual incident reports, but rather receives "a collection of trends . . . that . . . emanate from these other committees" and reviews "data and knowledge related to the quality of care delivered at the hospital." Incident reports, Shirilla claimed, are part of the peer-review process even though they are retained only in the risk-management office. Shirilla admitted, "[t]his is probably the first occurrence report that I've reviewed," and further acknowledged, "I don't believe a [peer review] committee reviewed this occurrence report."

Bonnie Schreiber, director of Munson's risk-management department, testified that she gave Hall a copy of the incident report several months before the trial. Schreiber admitted that when she and Hall composed answers to Harrison's discovery requests and drafted the affidavits signed by Munson personnel, she was personally aware of the incident report's contents. She further admitted that after speaking with Tembruell and learning of Tembruell's recollection of the surgical events, she took no action to amend or supplement earlier discovery responses indicating that no one at Munson recalled the events surrounding the burn. Like Shirilla, Schreiber disclaimed any knowledge of a "peer review file" regarding the burn incident.

During an in camera session with Judge Rodgers, Schreiber insisted that despite Gilliand's contemporaneous note that the Bovie "was laid on drape, in a fold,"

no one knew who had last handled it. While conceding that "[e]very person at that table had a responsibility to keep that patient safe," Schreiber expressed that what happened was an "accident" and maintained that the inadvertent-unholstering theory was not inconsistent with the incident report.

Judge Rodgers's examination of Gilliand, however, cast some doubt on the accidental-unholstering theory:

> *The Court*: So if it says the Bovie was laid on the drape, that's because you saw the Bovie laid on the drape?
>
> *The Witness*: To be honest with you, I don't know that I actually saw it laid on the drape. That may have been just a poor way of stating that. It may have—that's one of those things I try to be very articulate in my wording when it comes to things like this. And trying to get . . . my point across without showing blame at any one thing. . . .
>
> *The Court*: I'm not interested in blame.
>
> *The Witness*: I understand.
>
> *The Court*: Factually what happened.
>
> *The Witness*: I understand that. But I'm saying that I'm not really sure that I can see it laid on the drape. I am quite aways from the field.
>
> *The Court*: *Let me ask you this question. If it hadn't been laid on the drape, if it—it what—you had seen it becoming accidentally unholstered, would you have said Bovie accidentally unholstered?*
>
> *The Witness*: *If I had seen that, yes.* [Emphasis added.]

Peterson testified that she conducted one-on-one interviews with the people in the operating room before formulating her conclusion and recommendations. She expressed confidence that she had interviewed Gilliand and Babcock and told Judge Rodgers that nothing she had learned since the day she signed her report altered her conclusions.

One month after the evidentiary hearing, Judge Rodgers issued a lengthy written opinion, ruling that the incident report and related documents were privileged. Judge Rodgers further determined that Hall had violated Rule 3.1 and 3.3 of the Michigan Rules of Professional Conduct, by offering a defense that was inconsistent with known but undisclosed facts, and that Schreiber and Hall had violated MCR 2.114(D)(2), which requires that documents filed with the court be "well grounded in fact[.]" Based on these violations, Judge Rodgers ruled, sanctions would be assessed.

Judge Rodgers commenced his analysis by summarizing his initial impressions of the incident report:

> First and most importantly, the incident report reached a factual conclusion as to how the Bovie had come to penetrate the drape. Second, the Defendants claimed a peer review privilege and it was evident that the issues associated with peer review could not be resolved during the course of the jury trial. Third, if the facts associated with the described incident report were provided to the Plaintiff, the jury, and the Court, the Court would not allow expert testimony based on habit and practice regarding how the Bovie may have become unholstered which theories were inconsistent with the factual findings of the contemporaneous internal investigation.

Judge Rodgers proceeded to review the evidence provided during the evidentiary hearing. He made the following pertinent factual findings:

> When the Hospital was asked to explain how the Bovie came to burn a hole in the drape, the Hospital's consistent response was "unknown" or "may not ever be known" and explanations were then based on habit and custom. . . . Two members of the surgical team recalled the Bovie alarm being activated, that it was not in the Defendant Physician's hand, and that as he stepped away from the patient it was discovered between him and the Patient's body.

No individual has a present memory of how the Bovie came to be on the drape, unholstered and in a position to burn the patient. Since the standard of care requires the Bovie to be holstered, it was critical in this case to know whether it was improperly placed on the drape out of its holster and not promptly reholstered by a member of the surgical team, or whether it became accidentally unholstered in a way that was within the standard of care.

On this point, the Defendant Hospital stated that the event was "sudden, accidental and unpreventable" . . . . and "more than likely resulted from an inadvertent dislodging of the Bovie from its holster." According to the Hospital, "As all Defendants have maintained throughout, what happened to this patient was entirely inadvertent, and could not reasonably have been detected and/or prevented before it occurred." . . .

The conclusion of the internal investigation was diametrically opposed to the Defendant Hospital's statements. In fact, the Bovie had not become accidentally unholstered: "Bovie was laid on the drape," and the "Bovie holder was on field for this case, however, Bovie was not placed in it." . . . These facts were not charted. Whether or not laying the Bovie on the drape was determined by the Defendant Hospital to be a standard of care violation, a cause for discipline or grounds for the implementation of subsequent remedial measures are not facts sought by the Plaintiff nor would they be discoverable. Clearly, such internal conclusions drawn as part of the peer review process are protected from discovery for sound policy reasons.

Nevertheless, Judge Rodgers reasoned, the policy reasons are "not so broad as to allow the Defendant Hospital to ignore those facts and pretend they do not exist." Judge Rodgers continued, "The finding that the Bovie was laid on the drape and not placed in the holster is grossly inconsistent with an argument that the Bovie was properly holstered and then accidentally unholstered."

The facts noted by Gilliand and found by Peterson, Judge Rodgers elucidated, should have been recorded in Harrison's medical record. But if defendants elected not to document those facts in the patient's chart, Judge Rodgers drew upon MRPC 3.3(a)(1) and (3) to conclude that defendants nonetheless were "precluded ethically from offering an explanation that is inconsistent with those facts." The hospital's representations that the Bovie became inadvertently unholstered, Judge Rodgers found, constituted "affirmative misrepresentations and violations of the Michigan Rules of Professional Conduct." Judge Rodgers opined: "The Hospital's Risk Manager and defense counsel participated in a course of defense which, in this Court's opinion, is materially inconsistent with the findings of the contemporaneous investigation documented in the . . . incident report," thereby violating the previously cited rules of professional conduct.

Moreover, Judge Rodgers continued, defendants pursued a claim that expert testimony was required in this case despite awareness that "the unholstered Bovie was laid on the drape, a standard of care violation[.]" Had the actual known facts about the Bovie's placement been revealed, Judge Rodgers wrote, Munson likely would have admitted liability far sooner, without need for the "[s]ubstantial time and energy . . . wasted in the effort to learn how the Bovie came to penetrate the drape and burn the Plaintiff's arm." Judge Rodgers summarized: "The Court has not found a case that would allow the Defendant Hospital to fail to disclose the causation facts and present a defense inconsistent with them."

Judge Rodgers assessed Munson and Hall $53,958.69 in sanctions, jointly and severally. The sanctions represented travel and discovery expenses and attorney fees

arising from Miller's trial preparation. Munson brought a motion for reconsideration, contending that neither the hospital nor its counsel had any duty to review the incident report before trial and that Judge Rodgers had erroneously concluded that the incident report was inconsistent with the hospital's defense. In support of its motion, Munson submitted a new affidavit signed by Gilliand, attesting that she "would not have been sufficiently close to the operative field to see or hear the Bovie intraoperatively" and did not know whether the Bovie had been "intentionally" laid on the drape. Peterson, too, signed an affidavit averring that her conclusions were not based on "specific knowledge" or "facts" from any source to indicate that the Bovie device had been "intentionally placed on the drape by any individual(s) involved in the surgery."

In a written opinion denying reconsideration, Judge Rodgers addressed as follows the two newly filed affidavits:

> Finally, the submission of additional affidavits from two witnesses who testified at the evidentiary hearing is highly irregular. No witness has any present recollection of what occurred at the time of the surgery nor does Ms. Peterson have any present recollection of her investigation other than that she conducted one and it is reflected in her Incident Report. Given that all parties were represented by counsel at the evidentiary hearing, the submission of post-hearing affidavits not subject to cross examination regarding what these witnesses "intended" is inappropriate, self-serving and, in view of the testimony the Court received, of no substantive value.

Harrison brought a supplemental motion seeking additional sanctions representing costs and fees dating from the initiation of the litigation. Judge Rodgers also denied this motion.

Munson now appeals as of right, challenging the award of sanctions. Harrison cross-appeals as of right, arguing that she should have been granted additional sanctions. Hall also appeals as of right, asserting that he should not have been sanctioned. We consolidated these appeals.[8] As discussed in greater detail in the balance of this opinion, we affirm Judge Rodgers's decision to assess sanctions against Munson and Hall, as well as Judge Rodgers's refusal to assess additional sanctions. We further affirm the sanction amount. However, we remand to the trial court to divide the sanctions award into individualized penalties according to fault.

## II. ANALYSIS

### A. PEER-REVIEW PRIVILEGE

We begin by addressing the parties' claims regarding the peer-review privilege. Munson contends in its brief that because the incident report and related documents were privileged, neither Munson's risk manager nor Hall had a duty to review them before presenting a defense. Munson further asserts that "upon the trial court's proper determination that the Incident Report and other documents at issue were protected by the peer review privilege, further review and consideration of their content outside of the peer review process should have been foreclosed, and the inquiry brought to an end." Harrison counters that the documents were discoverable because Munson's medical peer-review system did not contemplate their confidentiality.

Munson's privilege claim rests on MCL 333.21515, which shelters peer-review "records, data, and knowl-

---

[8] We also granted the Michigan Society for Healthcare Risk Management's motion to file an amicus curiae brief. That brief was never filed in this Court.

edge" from court subpoena. We interpret and apply this statute de novo. See *People v Smith-Anthony*, 296 Mich App 413, 416; 821 NW2d 172 (2012).

> "When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the words of the statute. We give the words of a statute their plain and ordinary meaning, looking outside the statute to ascertain the Legislature's intent only if the statutory language is ambiguous. Where the language is unambiguous, 'we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written.' " [*Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1, 10; 654 NW2d 610 (2002), overruled in part on other grounds *Stand Up For Democracy v Secretary of State*, 492 Mich 588 (2012), quoting *Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002) (citations omitted).]

In addition to these statutory construction precepts, we take heed of the general rule that statutory privileges should be narrowly construed. *People v Warren*, 462 Mich 415, 427; 615 NW2d 691 (2000) (marital privilege); *In re Brock*, 442 Mich 101, 119; 499 NW2d 752 (1993) (physician-patient privilege). "Their construction should be no greater than necessary to promote the interests sought to be protected in the first place." *People v Wood*, 447 Mich 80, 91-92; 523 NW2d 477 (1994) (CAVANAGH, C.J., concurring).

Michigan's Public Health Code, MCL 333.1101 *et seq.*, directs that the "governing body" of a licensed hospital bears responsibility "for all phases of the operation of the hospital, selection of the medical staff, and quality of care rendered in the hospital." MCL 333.21513(a). To fulfill this command, hospitals must ensure that all physicians and other hospital personnel "who are required to be licensed or registered are in fact

currently licensed or registered." MCL 333.21513(b). Hospitals may grant physicians only those hospital privileges "consistent with their individual training, experience, and other qualifications." MCL 333.21513(c). And to encourage hospitals to implement and adhere to high standards of patient care, the Legislature imposes on hospitals an obligation to

> assure that physicians and dentists admitted to practice in the hospital are organized into a medical staff to enable an effective review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients. The review shall include the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital. [MCL 333.21513(d).]

This review function is commonly known as "peer review." "Hospitals are required [by MCL 333.21513(d)] to establish peer review committees whose purposes are to reduce morbidity and mortality and to ensure quality care." *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 41; 594 NW2d 455 (1999). "Peer review is 'essential to the continued improvement in the care and treatment of patients[.]' " *Feyz v Mercy Mem Hosp*, 475 Mich 663, 680; 719 NW2d 1 (2006), quoting *Dorris*, 460 Mich at 42 (additional quotation marks and citations omitted). To encourage candid, thorough peer-review assessments of hospital practices, the Legislature has shielded peer-review activities from "intrusive public involvement and from litigation." *Feyz*, 475 Mich at 680.

At issue here is the statutory provision removing from the scope of discovery "records, data, and knowledge" collected for or by peer-review entities. The relevant privilege statute provides in its entirety: "The records, data, and knowledge collected for or by indi-

viduals or committees assigned a review function described in this article [Article 17] are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena." MCL 333.21515.[9]

Whether a particular document qualifies as privileged under the peer-review statute depends on the circumstances surrounding its creation. Thus, when a litigant challenges a hospital's invocation of the peer-review privilege, an in camera evidentiary hearing is required. *Monty v Warren Hosp Corp*, 422 Mich 138, 144; 366 NW2d 198 (1985).[10] At the hearing, the documents at issue must be identified by date and author. *Id.* at 146. To assist in making a peer-review-privilege determination, a court may consult hospital bylaws and "internal regulations," and should consider whether "a particular committee was assigned a review function so that information it collected is protected," or "whether the committee's function is one of current patient care[.]" *Id.* at 147. "In determining whether any of the information requested is protected by the statutory privilege, the trial court should bear in mind that mere submission of information to a peer review committee does not satisfy the collection requirement so as to bring the information within the protection of the statute." *Id.* at 146-147.

---

[9] MCL 333.20175(8) similarly states:

The records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency, or an institution of higher education in this state that has colleges of osteopathic and human medicine, are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena.

[10] "An in camera proceeding is the appropriate vehicle to determine whether information requested in discovery proceedings is protected by a statutory privilege." *LeGendre v Monroe Co*, 234 Mich App 708, 742; 600 NW2d 78 (1999).

Judge Rodgers proceeded in accordance with *Monty* by reviewing the requested documents and related materials in camera and by convening an evidentiary hearing to test Munson's privilege claim. At oral argument, Munson's counsel conceded that Judge Rodgers's review of the documents was entirely proper. Accordingly, we reject Munson's arguments that Judge Rodgers's consideration of the documents exceeded that contemplated by *Monty* or that the peer-review privilege itself prohibited Judge Rodgers from reviewing the documents.

We next turn to the parties' arguments concerning whether the incident report was privileged. Judge Rodgers ruled that the "facts" contained in the incident report, "as opposed to the conclusions drawn in the report," should have been documented in Harrison's medical record. Nevertheless, Judge Rodgers found the incident report to be a "protected peer review document." We agree with Judge Rodgers in part. Gilliand's contemporaneous, handwritten operating-room observations were not subject to a peer-review privilege. In other words, the initial page of the incident report did not fall within the protection of MCL 333.21515. The balance of the report, however, reflected a review process and was confidential. As discussed in greater detail later in this opinion, peer-review protection from public disclosure does not shield Munson or Hall from the imposition of sanctions.

The peer-review-privilege statutes exempt from disclosure "[t]he records, data, and knowledge collected for or by individuals or committees assigned a professional review function[.]" MCL 333.20175(8). In construing this language, we remain mindful of *Monty*'s admonition that "mere submission of information to a peer review committee does not satisfy the collection re-

quirement . . . ." *Monty*, 422 Mich at 146. *Monty* further guides us to review the structure and function of the hospital's peer-review system, and identifies three cases from other jurisdictions that shed light on our interpretive task. We find the cases cited in *Monty* enlightening and utilize them as guideposts.

In *Bredice v Doctors Hosp, Inc*, 50 FRD 249 (D DC, 1970), the plaintiff sought " '[m]inutes and reports of any Board or Committee of Doctors Hospital or its staff' " concerning the death of the plaintiff's decedent. *Id.* at 249. The United States District Court for the District of Columbia relied on a common-law peer-review privilege to find that the minutes and reports were not subject to disclosure, reasoning that "[c]onfidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients." *Id.* at 250. Only upon a showing of "exceptional necessity," the court ruled, should such information be disclosed. *Id.* The court added:

> The purpose of these staff meetings is the improvement, through self-analysis, of the efficiency of medical procedures and techniques. They are not a part of current patient care but are in the nature of a retrospective review of the effectiveness of certain medical procedures. The value of these discussions and reviews in the education of the doctors who participate, and the medical students who sit in, is undeniable. This value would be destroyed if the meetings and the names of those participating were to be opened to the discovery process. [*Id.*]

*Davidson v Light*, 79 FRD 137 (D Colo, 1978), another case cited in *Monty*, arose from the plaintiff's development of a gangrenous leg. The plaintiff requested production of a report prepared by the defendant hospital's "Infection Control Committee." *Id.* at 139. The United States District Court for the District of

Colorado ordered the report produced and distinguished *Bredice*, finding that unlike in that case, the infection-control records "apparently contain[] both factual data relating to the plaintiff's infection, and opinions or evaluations by the review committee of the care received by the plaintiff from the staff." *Id*. The court continued: "The report's mixed nature indicates that the review committee involved here, unlike that in *Bredice*, functions as a part of current patient care, investigating the source of infections and attempting to control their proliferation." *Id*. Further, the district court judge explained, the Colorado Supreme Court had held in *Bernardi v Community Hosp Ass'n*, 166 Colo 280; 443 P2d 708 (1968), that factual information contained in an incident report was discoverable "because it is concerned primarily with the problem of a single patient, relates to current patient care, and is generated because of a specific incident or occurrence rather than a general desire for discussion or improvement." *Davidson*, 79 FRD at 140.

*Monty*'s third cited case, *Coburn v Seda*, 101 Wash 2d 270; 677 P2d 173 (1984), is particularly instructive. The plaintiff in *Coburn* propounded interrogatories to the defendant hospital seeking to learn whether a hospital review committee had considered the circumstances of a heart catheterization that led to the death of the plaintiff's decedent and whether " 'a written report' " had been prepared by the committee regarding the incident. *Id*. at 271-272. Applying Washington's peer-review-privilege statute, the Washington Supreme Court ruled that reports generated by the hospital's peer-review committees were protected from discovery. *Id*. at 275. Citing *Bredice* and *Davidson*, the court remanded to the trial court for a determination whether the statute applied to the particular committee

whose report was sought. *Id.* at 277-278. The Washington Supreme Court further instructed:

> The statute may not be used as a shield to obstruct proper discovery of information generated outside review committee meetings. The statute does not grant an immunity to information otherwise available from original sources. For example, any information from original sources would not be shielded merely by its introduction at a review committee meeting. Further, the hospital must identify all persons who have knowledge of the underlying event which is the basis of the malpractice action regardless of whether those persons presented evidence to a hospital review committee. [*Id.* at 277.]

We derive from these three cases a distinction between factual information objectively reporting contemporaneous observations or findings and "records, data, and knowledge" gathered to permit an effective review of professional practices. Gilliand's notation reporting that the Bovie "was laid on drape, in a fold" falls in the former category and as such was not privileged from disclosure, despite its inclusion on a form labeled "Quality/Safety Monitoring." Employing *Davidson*, we find it critical that Gilliand's note concerned a single patient and was "generated because of a specific incident or occurrence rather than a general desire for discussion or improvement." *Davidson* 79 FRD at 140. And as *Coburn* counseled, this information is not to be "shielded merely by its introduction at a review committee meeting." *Coburn*, 101 Wash 2d at 277. These excerpts from the cases cited by our Supreme Court in *Monty* give context to the *Monty* Court's admonition that "mere submission of information to a peer review committee does not satisfy the collection requirement . . . ." *Monty*, 422 Mich at 146. Here, Gilliand's preparation of a firsthand, contemporaneous factual report about a patient that she elected to place on a

risk-management form rather than within the patient's medical record did not trigger the statutory privilege.

*Centennial Healthcare Mgt Corp v Dep't of Consumer & Indus Servs*, 254 Mich App 275; 657 NW2d 746 (2002), buttresses our holding. In *Centennial*, the defendant state agency requested incident and accident reports as part of an investigation of a nursing home. *Id*. at 276-277. State administrative rules required that the plaintiff maintain accident and incident reports and make them available for review by the defendant. *Id*. at 280. The plaintiff insisted that incident reports were privileged pursuant to MCL 333.20175(8) because they were used for peer review. *Id*. at 277. This Court discerned no conflict between the administrative rule and the statute. We explained:

> Subsection 20175(8) is made up of five parts: (1) a list describing the types of items that are potentially covered by the peer review privilege [records, data, and knowledge]; (2) the requirement that these items be "collected for or by individuals or committees assigned a peer review function"; (3) a list of the entities to which the privilege applies; (4) the pronouncement that items satisfying these three criteria are "confidential"; and (5) a limit on the uses to which these items can be put, which includes the command that those uses are to be found in article 17 of the Public Health Code, as well as the specific directives that these items "are not public records" and "are not subject to court subpoena." [*Centennial*, 254 Mich App at 286, quoting MCL 333.20175(8).]

The Court observed that "a peer review committee could be said to have collected anything that it directs its facility to compile." *Centennial*, 254 Mich App at 290. This definition of the term "collect," the Court explained, would require "simply too broad a reading of the statutory privilege." *Id*. Rather, "in keeping with the interests the privilege is protecting," a peer-review

committee "collects" material by accumulating it for study. *Id.* The Court continued:

> Certainly, in the abstract, a peer review committee cannot properly review performance in a facility without hard facts at its disposal. However, it is not the facts themselves that are at the heart of the peer review process. Rather, it is what is done with those facts that is essential to the internal review process, i.e., a candid assessment of what those facts indicate, and the best way to improve the situation represented by those facts. *Simply put, the logic of the principle of confidentiality in the peer review context does not require construing the limits of the privilege to cover any and all factual material that is assembled at the direction of a peer review committee.*
>
> In the context of the circumstances in the case at bar, it is true that [the nursing home's] peer review committee could not effectively do its work without collecting basic information about the various incidents and accidents that occur at a nursing home. However, it is not the existence of the facts of an incident or accident that must be kept confidential in order for the committee to effectuate its purpose; it is how the committee discusses, deliberates, evaluates, and judges those facts that the privilege is designed to protect. [*Id.* at 290-291 (emphasis added) (citation omitted).]

We find *Centennial*'s reasoning compelling. MCL 333.20175(8) and MCL 333.21515 shield from disclosure materials accumulated for study by individuals or committees "assigned a professional review function." Objective facts gathered contemporaneously with an event do not fall within that definition.

Other courts interpreting peer-review statutes have similarly determined that facts concerning a patient's care, and in particular facts incorporated within an incident report, are not entitled to confidentiality. For example, in *Columbia/HCA Healthcare Corp v Eighth Judicial Dist Court*, 113 Nev 521, 531; 936 P2d 844

(1997), the Nevada Supreme Court observed that "[o]c-currence reports . . . are nothing more than factual narratives" which contain information usually unearthed in discovery. The Nebraska Supreme Court held in *State ex rel AMISUB, Inc v Buckley*, 260 Neb 596, 614; 618 NW2d 684 (2000), that "[r]eports which are merely factual accounts or fact compilations relating to the care of a specific patient are not privileged" under the Nebraska peer-review statutes. The Court reasoned:

> The [statutory] language . . . does not protect antecedent reports relating to the care of a specific patient which memorialize bare facts and which were written by or collected from percipient witnesses notwithstanding the fact that such documents may have been forwarded to a hospital-wide committee, nor does [the statute] protect an assembly of such facts outside the committees identified in [the statute]. [*Id.*]

The Arizona Court of Appeals concluded in *John C Lincoln Hosp & Health Ctr v Superior Court*, 159 Ariz 456, 459; 768 P2d 188 (1989), that because incident reports "are issued by hospital personnel in the regular course of providing medical care," they did not fall within Arizona's peer-review-privilege statute. The Court reasoned:

> These reports are intended for use whenever there is an unusual occurrence of any kind in the day-to-day administration of the hospital. Thus they are very broad in nature and cover situations as diverse as an electrical failure, a patient's loss of personal articles, and an incorrect type of anesthesia. Though Incident Reports sometimes precipitate peer review, they do not always do so, and they are not made solely for that purpose. [*Id.*]

And the Connecticut Supreme Court explained in *Babcock v Bridgeport Hosp*, 251 Conn 790, 838; 742 A2d 322 (1999), that based on the language of that state's statute, "the notations of a treating physician or nurse

are not protected, even if those notations are utilized in a study of morbidity or mortality undertaken for the purpose of improving the quality of care."

Here, Shirilla confirmed that Munson's quality committee does not "collect" or even review incident reports. He and Schreiber agreed that at Munson, incident reports are stored within the risk-management department and are not provided to peer-review committees for study. And Schreiber acknowledged that no "peer review file" was ever created concerning Harrison's burn. Given this evidence, we conclude that the factual information recorded on the first page of the incident report was not immune from disclosure as material collected pursuant to MCL 333.21515. To hold otherwise would grant risk managers the power to unilaterally insulate from discovery firsthand observations that the risk managers would prefer remain concealed. The peer-review statutes do not sweep so broadly.

We reach a different conclusion, however, regarding the incident report's remaining pages. In the balance of the document, Peterson or another Munson employee summarized the result of the investigation Peterson conducted in her role as a peer reviewer: that the burn occurred because someone failed to reholster the Bovie. The documentation following Gilliand's note reflects a deliberative review process. Judge Rodgers correctly concluded that this portion of the incident report qualified as confidential.

Against this legal backdrop, we turn to Munson's argument that because the incident report was a peer-review-privileged document, Schreiber and Hall had no duty to consider it while defending Harrison's malpractice claim. For the sake of this argument, we assume

that Schreiber appropriately believed that the entirety of the incident report was confidential pursuant to MCL 333.21515.

We are somewhat puzzled by Munson's duty argument, because the testimony established without dispute that Schreiber and Hall *did* read the incident report and knew its contents. In her testimony before Judge Rodgers, Schreiber admitted that she had been aware of Gilliand's note and Peterson's analysis throughout the litigation. Schreiber verified that Hall was given a copy of the incident report at least a month before the trial. Thus, Munson's duty argument has no application to the facts of this case. Nor do we accept as a general proposition, divorced from this case, that a risk manager may deliberately avoid reviewing or considering relevant *factual* information if doing so involves consulting potentially privileged documents. Certainly, the peer-review-privilege statutes were not intended to prevent a hospital from reviewing its own records. And we have located no law from any jurisdiction suggesting that a hospital may ethically present a medical malpractice defense directly conflicting with the hospital's knowledge of how an event occurred.

Consequently, we discern nothing in the language of the peer-review statutes that would have precluded Schreiber from reviewing the incident report. We express no opinion regarding whether Munson should have produced the first page of the incident report to Harrison during discovery. As hereafter discussed in greater detail, Judge Rodgers did not sanction Munson and Hall based on their failure to *produce* the report. Judge Rodgers imposed the sanctions because he determined that Munson and Hall presented a defense in fundamental conflict with the facts contained in the incident report. We next consider the propriety of the sanction rulings.

B. THE SANCTIONS

Judge Rodgers grounded his sanctions order on his finding that Munson and Hall put forward a defense that was inconsistent with "known but undisclosed facts." Judge Rodgers wrote: "The finding that the Bovie was laid on the drape and not placed in the holster is grossly inconsistent with an argument that the Bovie was properly holstered and then accidentally unholstered." Judge Rodgers invoked several court rules, a statute, and two rules of professional responsibility as support for his sanctions assessment.

Munson and Hall assert that Gilliand's note and Peterson's conclusions were ambiguous, vague, and entirely consistent with the "accident" defense. According to Munson and Hall, Judge Rodgers clearly erred by finding "that the Bovie was intentionally set down upon the drape instead of being placed in its holster[.]" Hall emphasizes: "The trial court opinion has a single underlying assumption: that the Bovie device was *deliberately* laid on the drape." Because that assumption should not have been made, Hall contends, this Court should reverse the sanction award.[11]

"Trial courts possess the inherent authority to sanction litigants and their counsel[.]" *Maldonado v Ford Motor* Co, 476 Mich 372, 388; 719 NW2d 809 (2006). We review for an abuse of discretion a court's exercise of that power. *Id*. A court abuses its discretion when it reaches a decision that falls outside the range of principled outcomes. *Id*. Judge Rodgers sanctioned Munson and Hall pursuant to MCR 2.114(D) and (E), as well as

---

[11] The affidavits rejected by Judge Rodgers similarly attested that the affiants did not know whether the Bovie had been "intentionally" laid on the drape. Given that medical malpractice actions employ a negligence standard of care, whether the Bovie was "intentionally" placed on the drape is of no legal consequence.

MCL 600.2591(2), and sanctioned Hall separately pursuant to MRPC 3.1 and 3.3. "The interpretation and application of a court rule involves a question of law that this Court reviews de novo." *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 387; 761 NW2d 353 (2008). We also review de novo a trial court's construction of the Michigan Rules of Professional Conduct. *Grievance Administrator v Fieger*, 476 Mich 231, 240; 719 NW2d 123 (2006). This Court reviews for clear error any factual findings underlying a trial court's decision. MCR 2.613(C). "A trial court's finding[] with regard to whether a claim or defense was frivolous, and whether sanctions may be imposed, will not be disturbed unless it is clearly erroneous." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 533; 773 NW2d 57 (2009). "A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made." *Johnson*, 281 Mich App at 387.

We initially address defendants' contention that Judge Rodgers clearly erred by finding that the Bovie was "intentionally" or "deliberately" placed on the drape. Defendants misapprehend Judge Rodgers's findings. At no point in his 12-page opinion did Judge Rodgers refer to intentional or deliberate conduct on the part of the operating room team. The words "intentional" or "intentionally" do not appear in Judge Rodgers's opinion. Contrary to defendants' argument, Judge Rodgers made no finding that the Bovie had been "intentionally" laid on the drape.

Rather, Judge Rodgers's factual findings assumed the accuracy of Gilliand's notation and Peterson's conclusion. In construing the words used by both witnesses, Judge Rodgers interpreted the writings according to their plain, ordinary, everyday meanings. Gilliand

reported: "during [the] procedure [the] bovie was laid on [the] drape, in a fold." In normal, everyday parlance, the term "was laid" is used to describe the putting or placing of an object in a certain location.[12] Defendants contend that Judge Rodgers should have interpreted Gilliand's words as meaning that the Bovie "was lying" on the drape. A reasonable construction of Peterson's note resolves this dispute. After interviewing the operating-room participants, Peterson decided that the "Bovie holder was on field for this case, however bovie *was not placed in it.*" (Emphasis added.) Thus, Judge Rodgers interpreted both Gilliand's and Peterson's words in a logical and reasonable fashion.

Moreover, whether an operating-room participant *deliberately* laid the Bovie on the drape or did so *negligently* or *accidentally* lacks relevance given defendants' admission that the standard of care required reholstering the Bovie after each use. Assuming that the Bovie was accidentally laid on the drape does not excuse defendants from reholstering it, according to their own testimony that the standard of care required reholstering after each use. Moreover, defendants' argument that Judge Rodgers misinterpreted the incident report rings particularly hollow in light of the information that Munson willingly provided to Harrison before the litigation commenced: that the event had been "confidentially reviewed" and that as a result, the

---

[12] For instance: "Plaintiff and his mother-in-law both testified that the baby was laid upon an electric pad." *Wabeke v Bull*, 289 Mich 551, 555; 286 NW 825 (1939) (BUSHNELL, J., dissenting); "Hansen testified that defendant's coat was laid over the old man's body in the car and was blood-stained." *People v McKernan*, 236 Mich 226, 231; 210 NW 219 (1926); "Where the ends of the boxes were stationary, one end of the timber was laid down in the bottom of the car, and the other end projected over the end of the box in cases where the timber was longer than the box." *Dewey v Detroit, G H & M R Co*, 97 Mich 329, 335; 56 NW 756 (1893).

hospital had "reinforced . . . [t]he mandatory and active use of cautery protective devices anytime cautery is used." Had Munson's internal investigation revealed that the Bovie's transit to the drape was entirely inadvertent rather than the product of some human action, we question why the hospital would have shared with Harrison its intent to reinforce the "mandatory and active use" of Bovie holsters.

Finally, Gilliand's belated claim that she did not actually see someone "lay" the Bovie on the drape bears no relevance to Judge Rodgers's factual findings. Gilliand was the sole source of firsthand, contemporaneous factual information about the Bovie's appearance on the drape. As such, the evidence that she could have provided was unique. Had Gilliand been deposed by an attorney in possession of her note, she likely would have conceded the obvious: that reasonably interpreted, her words could be understood to mean that a surgery participant laid the Bovie on the drape. The trier of fact may draw reasonable inferences from direct or circumstantial evidence in the record. *People v Vaughn*, 186 Mich App 376, 379-380; 465 NW2d 365 (1990). Gilliand's choice of words and Peterson's conclusions render reasonable a deduction that the Bovie was placed or put on the drape by someone who had held it and negligently failed to return it to its safe holding place. Thus, Judge Rodgers did not clearly err by finding that a surgical participant "laid" the Bovie on the drape (accidentally, negligently or deliberately) and that that person, or another individual in the room, negligently failed to holster it.[13]

---

[13] The clear error standard is deferential. *People v Zahn*, 234 Mich App 438, 445; 594 NW2d 120 (1999). "Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it."

We now consider the legal bases for the sanctions imposed. MCR 2.114(E) requires sanctions if an attorney or party signs a document in violation of MCR 2.114(D), which provides:

> The signature of an attorney or party, whether or not the party is represented by an attorney, constitutes a certification by the signer that
>
> (1) he or she has read the document;
>
> (2) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and
>
> (3) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Similarly, MCL 600.2591(1) provides:

> Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

The statute defines "frivolous" to include that a party "had no reasonable basis to believe that the facts underlying that party's legal position were in fact true." MCL 600.2591(3)(a)(*ii*).

MCR 2.114 "provides for an award of sanctions against both a party and his counsel for not making reasonable inquiry as to whether a pleading is well grounded in fact[.]" *Briarwood v Faber's Fabrics, Inc,*

---

MCR 2.613(C). Judge Rodgers had the benefit of questioning Gilliand and Peterson about their notes. That their words are potentially susceptible of another meaning does not render Judge Rodgers's factual findings clearly erroneous.

163 Mich App 784, 792; 415 NW2d 310 (1987). Sanctions may be assessed without regard to whether the pleader harbored an improper purpose. *Id.* at 792-793. The purpose for punishing with sanctions the introduction of frivolous claims "is to deter parties and attorneys from filing documents or asserting claims and defenses that have not been sufficiently investigated and researched or that are intended to serve an improper purpose." *FMB-First Mich Bank v Bailey*, 232 Mich App 711, 723; 591 NW2d 676 (1998). In *BJ's & Sons Constr Co, Inc v Van Sickle*, 266 Mich App 400, 406; 700 NW2d 432 (2005) (quotation marks and citation omitted), this Court cited with approval a federal court's observation that sanctions "are essentially deterrent in nature, imposed in an effort to discourage dilatory tactics and the maintenance of untenable positions."

Judge Rodgers determined that Schreiber, Munson's risk manager, knew throughout the litigation that a contemporaneous investigation had revealed that someone in the operating room failed to reholster the Bovie after its use. Schreiber was also aware of Dr. Potthoff's testimony that the standard of care required reholstering the Bovie "absolutely every time." This evidence, Judge Rodgers concluded, was susceptible to only one reasonable conclusion: Harrison's burn occurred because someone in the operating room negligently failed to reholster the Bovie after using it. Sanctions were warranted, Judge Rodgers ruled, because Munson concealed facts that would have pointed directly to its negligence and instead created a causation theory that was contradicted by evidence gathered by Munson itself.

Munson's conduct in creating an "accident" defense scenario despite its possession of direct evidence con-

trary to that position qualifies as a violation of MCL 600.2591(3)(a)(*ii*), which prohibits a party from advancing a claim or defense when the party has "no reasonable basis to believe that the facts underlying that party's legal position were in fact true." Munson presented no evidence in the trial court conflicting with Gilliand's account that the Bovie "was laid" on the drape. Nor did Munson supply evidence that Peterson had conducted a faulty investigation or had misinterpreted the data she considered. Rather, Munson interposed "habit and practice" evidence while fully aware that the habit had not been followed in Harrison's case. Judge Rodgers did not abuse his discretion by finding that Munson invoked MRE 406 in bad faith by introducing habit-and-practice evidence to prove conformity of conduct despite that the evidence known only to Munson soundly contradicted that defense.

In addition to these violations of MCL 600.2591(3)(a)(*ii*), Munson obstructed Harrison's search for the truth throughout discovery by: (1) repeatedly insisting that no one had any information about what had happened, despite that Tembruell and Babcock clearly remembered the procedure, (2) preparing an affidavit for Burgett's signature attesting that he had never handled a Bovie, despite Dr. Potthoff's testimony to the contrary, and (3) asserting in numerous filings that the burn was "caused by acts and occurrences outside the control of the surgical team," in contradiction of the facts contained in the incident report. The pleadings containing these attestations, Judge Rodgers ruled, were not well grounded in the facts known to Munson. The record evidence substantiates these findings. Accordingly, Judge Rodgers's determination that defendants' conduct contravened MCR 2.114 fell within the range of reasonable and principled outcomes, and his imposition of sanctions did not qualify as an abuse of discretion.

In affirming the sanctions order against Munson, we emphasize that statutory privileges were not intended by the Legislature as licenses to subvert the discovery process, or as shields for the presentation of false or misleading evidence. By protecting peer review from external scrutiny, Michigan's Public Health Code does not concomitantly erect a barrier to a patient's quest for objective facts concerning the patient's own surgical procedure. The discovery process is designed to allow the parties to fully explore the facts underlying a controversy as inexpensively and expeditiously as possible, and without gamesmanship. The peer-review statutes do not create an exception to this principle. Nor does any privilege, including that created for peer review, prevent a court from safeguarding the integrity of its administration of justice.

Judge Rodgers sanctioned Hall pursuant to MCR 2.114 as well as MRPC 3.3(a)(3), which prohibits an attorney from offering evidence that the attorney knows to be false, MRPC 3.3(a)(1), which disallows false statements of material fact made to a tribunal, and MRPC 3.1, which prohibits an attorney from defending a proceeding or controverting an issue "unless there is a basis for doing so that is not frivolous." Hall admitted receiving the incident report before the trial. He further admitted during the evidentiary hearing that the "facts" stated in the incident report were not the same as those in Harrison's medical record, and he conceded that perhaps they should have been. Hall nevertheless insisted that he stood "personally and professionally" by the "veracity" of the discovery answers he drafted.

We affirm Judge Rodgers's determination that Hall violated MCR 2.114 and MRPC 3.1 by pursing an "accident" defense after reading Gilliand's note and Peterson's attribution of the burn's cause to a failure to

reholster the Bovie. Once in possession of that information, Hall had an ethical obligation to withhold an "accident" defense. Indeed, an admission of liability was forthcoming after the information contained in the incident report came to light. Hall bore a concomitant ethical obligation to amend and supplement the answer he had provided to Harrison's request for admission early in the case. That request sought Munson's admission that the "individuals who were responsible for the electrocautery device" were Munson employees acting in the course of their employment. Instead of answering this request, Munson relied on a boilerplate objection and referred Harrison to the medical record. When Hall reviewed the incident report, he was under an affirmative duty to change Munson's answer to a simple admission. See also MCR 2.302(E)(1)(b)(ii) (setting forth a duty to amend a discovery answer when a party obtains information indicating that a former response, "though correct when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment").

Moreover, Hall had received the incident report before Gilliand's trial deposition was taken, and knew that Gilliand had authored the note and participated in Peterson's follow-up investigation. Despite his knowledge of these facts, Hall did nothing to correct Gilliand's patently incorrect deposition testimony that: (1) if the event had happened while she was in the operating room, she would have written something about it in the patient's hospital record, (2) if she had seen a burn, she would have recorded that finding in the patient's record, (3) she had never been involved in a procedure in which a Bovie had inadvertently burned a patient, and (4) she did not recall being contacted by Peterson about what took place during the surgery. Hall's acquiescence in presenting Gilliand's testimony, despite

awareness that the incident report substantially contradicted many of Gilliand's statements, suffices to establish an ethical violation under MRPC 3.3(a)(3).

Nevertheless, we believe that Judge Rodgers erred by failing to render separate sanctions awards in this case. Given the limited time he had access to the incident report, Hall's culpability is far less than that of Munson. On remand, Munson may elect to take full responsibility for the sanctions award. Should Munson chose not to do so, the court must conduct a hearing in which Hall's personal liability for the amounts awarded is clarified. Hall may not be sanctioned for costs or fees that arose before the date that he was provided the incident report.

We have reviewed Harrison's claim for additional sanctions but find it without merit for the reasons stated by Judge Rodgers.

We affirm the sanctions award but remand for individualized assessments against Hall and Munson. We do not retain jurisdiction.

OWENS, P.J., and BORRELLO, J., concurred with GLEICHER, J.